In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-4351

BEN'S BAR, INC.,

*Plaintiff-Appellant,*

v.

VILLAGE OF SOMERSET,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 01 C 821—**Barbara B. Crabb**, *Chief Judge.*

ARGUED MAY 30, 2002—DECIDED JANUARY 17, 2003

Before FLAUM, *Chief Judge*, and HARLINGTON WOOD, JR.
and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Ben's Bar, Inc. operates a tavern
in the Village of Somerset, Wisconsin, that formerly served
as a venue for nude and semi-nude dancing. After the
Village enacted an ordinance that, in part, prohibited the
sale, use, or consumption of alcohol on the premises of
"Sexually Oriented Businesses," Ben's Bar and two of its
dancers filed suit under 42 U.S.C. § 1983, seeking declara-
tory and injunctive relief against the enforcement of the
ordinance. The plaintiffs' complaint alleged, among other
things, that the ordinance's alcohol prohibition violated

their right to freedom of expression under the First and Fourteenth Amendments to the United States Constitution. Shortly thereafter, plaintiffs filed a motion for a preliminary injunction, which the district court denied. The Village then filed a motion for summary judgment, which the district court granted. Ben's Bar appeals this decision. Because we conclude that the record sufficiently supports the Village's claim that the liquor prohibition is a reasonable attempt to reduce or eliminate the undesirable "secondary effects" associated with barroom adult entertainment, rather than an attempt to regulate the expressive content of nude dancing, we affirm the district court's judgment.

## I.

On October 24, 2000, the Village of Somerset, a municipal corporation located in St. Croix County, Wisconsin ("Village"), enacted Ordinance A-472, entitled "Sexually Oriented Business Ordinance" ("Ordinance"), for the purpose of regulating "Sexually Oriented Businesses and related activities to promote the health, safety, and general welfare of the citizens of the Village of Somerset, and to establish reasonable and uniform regulations to prevent the deleterious location and concentration of Sexually Oriented Businesses within the Village of Somerset." The Ordinance regulates hours of operation, location, distance between patrons and performers, and other aspects concerning the operations of Sexually Oriented Businesses.

In the legislative findings section of the Ordinance, the Village noted that:

> Based on evidence concerning the adverse secondary effects of Sexually Oriented Businesses on the community in reports made available to the Village Board,

and on the holdings and findings in [numerous Supreme Court, federal appellate, and state appellate judicial decisions], as well as studies and summaries of studies conducted in other cities . . . and findings reported in the Regulation of Adult Entertainment Establishments in St. Croix County, Wisconsin; and the Report of the Attorney General's Working Group of Sexually Oriented Businesses . . . the Village Board finds that:

(a) Crime statistics show that all types of crimes, especially sex-related crimes, occur with more frequency in neighborhoods where sexually oriented businesses are located.

(b) Studies of the relationship between sexually oriented businesses and neighborhood property values have found a negative impact on both residential and commercial property values.

(c) Sexually oriented businesses may contribute to an increased public health risk through the spread of sexually transmitted diseases.

(d) There is an increase in the potential for infiltration by organized crime for the purpose of unlawful conduct.

(e) *The consumption of alcoholic beverages on the premises of a Sexually Oriented Business exacerbates the deleterious secondary effects of such businesses on the community.*

(Emphasis added.)

On February 2, 2001, two months before the Ordinance's effective date of April 1, 2001, Ben's Bar, Inc. ("Ben's Bar"),

a tavern in the Village featuring nude and semi-nude barroom dance,[1] and two of its dancers, Shannen Richards and Jamie Sleight, filed a four-count complaint against the Village, pursuant to 42 U.S.C. § 1983 and Wis. Stat. § 806.04 (the State's "Uniform Declaratory Judgments Act"), in the United States District Court for the Western District of Wisconsin. The plaintiffs' complaint alleged that portions of the Ordinance were unconstitutional and pre-empted by Wisconsin law, sought a declaratory judgment resolving those issues, and requested permanent injunctive relief. Specifically, the plaintiffs argued that the Ordinance: (1) violated their right of free expression under the First and Fourteenth Amendments to the United States Constitution and Article I, § 3 of the Wisconsin Constitution;[2] (2) violated their right to equal protection under the Fourteenth Amendment to the United States Constitution and Article 1, § 1 of the Wisconsin Constitution;[3] (3) was an illegal "policy or custom" of the Village within the meaning of *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978), and *Owen v. City of Independence, Missouri*, 445 U.S. 622 (1980); and (4) was

---

[1]  Ben's Bar holds a liquor license issued by the Village.

[2]  Article 1, § 3 of the Wisconsin Constitution provides, *inter alia*, that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press." Wis. Const., art. I, § 3.

[3]  Article 1, § 1 of the Wisconsin Constitution provides that "[a]ll people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." Wis. Const., art. I, § 1.

an *ultra vires* legislative act in violation of Wis. Stat. § 66.0107(3).[4]

On March 19, 2001, the plaintiffs moved for a preliminary injunction against the enforcement of Sections 5(a) and (b) of the Ordinance. Section 5(a) provides that "[i]t shall be a violation of this ordinance for any Person to knowingly and intentionally appear in a state of Nudity in a Sexually Oriented Business."[5] Section 5(b) of the Ordinance provides that "[t]he sale, use, or consumption of alcoholic beverages on the Premises of a Sexually Oriented Business is prohibited." Plaintiffs argued that under § 66.0107(3) the Village was prohibited from enacting these regulations of adult entertainment because such conduct is already covered by the state's obscenity statute—i.e., Wis. Stat. § 944.21. They also contended that, notwithstanding § 66.0107, Sections 5(a) and (b) violated their right to free expression under the First and Fourteenth Amendments.

On April 17, 2001, the district court denied plaintiffs' motion for preliminary injunctive relief, holding that they did not have a reasonable chance of succeeding on the merits of their complaint. The district court, utilizing the test established by this circuit in *Schultz v. City of Cumber-*

---

[4] Wis. Stat. § 66.0107(3) provides that "[t]he board or council of a city, village or town may not, by ordinance, prohibit conduct which is the same as or similar to conduct prohibited by § 944.21 [i.e., the state's obscenity statute]."

[5] Under Section 3(o) of the Ordinance, "Nudity" or "state of nudity" is defined as "the appearance of the human bare anus, anal cleft or cleavage, pubic area, male genitals, female genitals, or the nipple or areola of the female breast, with less than a fully opaque covering; or showing of the covered male genitals in a discernibly turgid state."

*land*, 228 F.3d 831 (7th Cir. 2000), held that Section 5(a)'s complete prohibition of full nudity in Sexually Oriented Businesses was constitutional under the First Amendment because " 'limiting erotic dancing to semi-nudity [i.e., pasties and G-strings] represents a *de minimis* restriction that does not unconstitutionally abridge expression.' " (quoting *Schultz*, 228 F.3d at 847). The district court also concluded that Section 5(b) passed constitutional muster under *Schultz* because it: (1) was justified without reference to the content of the regulated speech; (2) was narrowly tailored to serve a significant government interest in curbing adverse secondary effects; and (3) left open ample alternative channels for communication. Finally, the district court ruled that the Ordinance was not subject to preemption under Wis. Stat. § 66.0107(3) because the plaintiffs had conceded that: (1) the Ordinance only regulates non-obscene conduct; and (2) they were seeking only to provide non-obscene barroom dancing.

Following unsuccessful attempts at settlement, on August 20, 2001, the Village moved for summary judgment of plaintiffs' complaint. On November 23, 2001, the district court granted the Village's motion, concluding that the Ordinance was constitutional for the reasons expressed in its April 17, 2001 order. The court also addressed plaintiffs' equal protection claim, noting that they had waived the argument by failing to develop it in their briefs. A judgment in conformity with that order was entered on November 26, 2001. Ben's Bar appeals the district court's decision granting summary judgment,[6] arguing that the court erred in concluding that Section 5(b) does not constitute an unconstitutional restriction

---

[6] Plaintiffs Shannen Richards and Jamie Sleight did not appeal the district court's judgment.

on nude dancing under the First Amendment. *See DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 827 n.2 (7th Cir. 1999) (holding that corporations may assert First Amendment challenges). We review the district court's grant of summary judgment *de novo*, construing all facts in favor of Ben's Bar, the non-moving party. *Commercial Underwriters Ins. Co. v. Aires Envtl. Services, Ltd.*, 259 F.3d 792, 795 (7th Cir. 2001).

## II.

The First Amendment provides, in part, that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. The First Amendment's Free Speech Clause has been held by the Supreme Court to apply to the states through the Fourteenth Amendment's due process clause. *Gitlow v. New York*, 268 U.S. 652, 666 (1925); *DiMa Corp.*, 185 F.3d at 826 (acknowledging the applicability of the Supreme Court's "incorporation doctrine" in the First Amendment context). The Supreme Court has further held that "nude dancing . . . is expressive conduct *within the outer perimeters of the First Amendment*, though we view it as only marginally so." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) (plurality opinion) (emphasis added). *See also Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1124 (7th Cir. 2001) (noting that "[t]he impairment of First Amendment values is slight to the point of being risible since the expressive activity involved in the kind of striptease entertainment provided in a bar has at best a modest social value . . . ."). Thus, while few would argue "that erotic dancing . . . represents high artistic expression," *Schultz v. City of Cumberland*, 228 F.3d 831, 839 (7th Cir. 2000), the Supreme Court has, nevertheless, afforded such expression a diminished form of protection under the First Amendment. *City of Erie v. Pap's*

*A.M.*, 529 U.S. 277, 294 (2000) (plurality opinion) (holding that " 'even though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, *it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate . . . .' "*) (citation omitted) (emphasis added).

This case requires us to determine whether a municipality may restrict the sale or consumption of alcohol on the premises of businesses that serve as venues for adult entertainment without violating the First Amendment. On appeal, Ben's Bar's primary argument is that Section 5(b) is unconstitutional because the regulation has the "effect" of requiring its dancers to wear more attire than simply pasties and G-strings.[7] This argument may be summed up as follows: (1) Section 5(b) prohibits the sale, use, or consumption of alcohol on the premises of Sexually Oriented Businesses;[8] (2) Ben's Bar is an "Adult cabaret," a sub-category of a Sexually Oriented Business under the Ordinance,[9] if it features nude or semi-nude

---

[7] The Supreme Court has, on two separate occasions, held that requiring nude dancers to wear pasties and G-strings does not violate the First Amendment. *Pap's A.M.*, 529 U.S. at 301 (plurality opinion), *id.* at 307-10 (Scalia, J., concurring); *Barnes*, 501 U.S. at 571-72 (plurality opinion), *id.* at 582 (Souter, J., concurring).

[8] Section 3(w) of the Ordinance defines "Sexually Oriented Business" as "an adult arcade, adult bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, escort agency or sexual encounter center."

[9] Section 3(c) of the Ordinance is the definition for "Adult cabaret," which "means a nightclub, dance hall, *bar*, restaurant,

(continued...)

dancers; (3) Section 3(o) of the Ordinance defines "semi-nude or semi-nudity" as "the exposure of a bare male or female buttocks or the female breast below a horizontal line across the top of the areola at its highest point with less than a complete and opaque covering"; and (4) Ben's Bar's dancers must wear more attire than that required by the Ordinance's definition of "semi-nude or semi-nudity" in order for the tavern to be able to sell alcohol during their performances and comply with Section 5(b)— i.e., more than pasties and G-strings. Ben's Bar contends that Section 5(b) significantly impairs the conveyance of an erotic message by the tavern's dancers[10] and is not narrowly tailored to meet the Village's stated goal of reducing the adverse secondary effects associated with adult entertainment.[11]

---

[9] (...continued)
or similar commercial establishment that regularly features: (1) persons who appear in a state of Nudity or Semi-nudity; or (2) live performances that are characterized by 'specified sexual activities'; or (3) films, motion pictures, video cassettes, slides, or other photographic reproductions that are characterized by the depiction or description of 'specified sexual activities' or Nudity or 'specified anatomical areas.' " (Emphasis added.)

[10] According to Ben's Bar, Section 5(b) goes far beyond the pasties and G-strings regulation upheld by the Supreme Court in *Barnes* and *Pap's A.M.*, prohibiting "any display of the buttocks or of breast below the top of the areola"—i.e., "conservative two piece swimsuits, moderately low-cut blouses, short shorts, sheer fabrics and many other types of clothing that are regularly worn in the community and are in mainstream fashion."

[11] It is not entirely clear whether Ben's Bar is arguing that Section 5(b) is facially unconstitutional or merely unconstitutional
(continued...)

The central fallacy in Ben's Bar's argument, however, is that Section 5(b) restricts the sale and consumption of alcoholic beverages in establishments that serve as venues for adult entertainment, not the attire of nude dancers. In the absence of alcohol, Ben's Bar's dancers are free to express themselves all the way down to their pasties and G-strings. The question then is not whether the Village can require nude dancers to wear more attire than pasties and G-strings, but whether it can prohibit Sexually Oriented Businesses like Ben's Bar from selling alcoholic beverages in order to prevent the deleterious secondary effects arising from the explosive combination of nude dancing and alcohol consumption.

While the question presented is rather straightforward, the issue is significantly complicated by a long series of Supreme Court decisions involving the application of the First Amendment in the adult entertainment context. Because these decisions establish the analytical framework under which we must operate, our analysis necessarily begins with a comprehensive summary of the Supreme Court's jurisprudence in this area.

---

[11] (...continued)
as applied. To the extent Ben's Bar seeks to bring a facial challenge, it faces an uphill battle. Ben's Bar does not argue that the regulation is vague or overbroad, and therefore may only prevail if it can demonstrate "that no set of circumstances exists under which the [regulation] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). *See also Horton v. City of St. Augustine, Florida*, 272 F.3d 1318, 1331 (11th Cir. 2001) (noting exception to the *Salerno* rule; that, in the limited context of the First Amendment, a plaintiff may also bring a facial challenge for overbreadth and/or vagueness).

**A.** *California v. LaRue*

Initially, we note that the Supreme Court addressed the precise issue before us in *California v. LaRue*, 409 U.S. 109 (1972), when it considered the constitutionality of regulations promulgated by California's Department of Alcoholic Beverages ("Department") that prohibited bars and nightclubs from featuring varying degrees of adult entertainment.[12] The Department enacted the regulations, after holding public hearings, because it concluded that the consumption of alcohol in adult entertainment establishments resulted in a number of adverse secondary effects—e.g., acts of public indecency and sex-related crimes. As in this case, adult entertainment businesses filed suit alleging that the regulations violated the First Amendment. *Id.* at 110.

---

[12] The regulations at issue in *LaRue* prohibited:

   (a) The performance of acts, or simulated acts, of sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation or any sexual acts which are prohibited by law;

   (b) The actual or simulated touching, caressing or fondling on the breast, buttocks, anus or genitals;

   (c) The actual or simulated displaying of the pubic hair, anus, vulva or genitals;

   (d) The permitting by a licensee of any person to remain in or upon the licensed premises who exposes to public view any portion of his or her genitals or anus; and, by a companion section;

   (e) The displaying of films or pictures depicting acts a live performance of which was prohibited by the regulations quoted above.

409 U.S. at 411-12.

The Supreme Court began its analysis in *LaRue* by stressing that "[t]he state regulations here challenged come to us, not in the context of a dramatic performance in a theater, but rather in a context of licensing bars and nightclubs to sell liquor by the drink." 409 U.S. at 114. For this reason, the vast majority of the Court's opinion addressed the States' power to regulate "intoxicating liquors" under the Twenty-first Amendment.[13] *See generally id.* at 115-19. Specifically, the *LaRue* Court concluded that:

> While the States, vested as they are with general police power, require no specific grant of authority in the Federal Constitution to legislate with respect to matters traditionally within the scope of the police power, the broad sweep of the Twenty-first Amendment has been recognized as conferring something more than the normal state authority over public health, welfare, and morals.

409 U.S. at 114.

In doing so, the *LaRue* Court rejected the plaintiffs' contention that the state's regulatory authority over "intoxicating beverages" was limited, as applied to adult entertainment establishments, to "either dealing with the problem it confronted within the limits of our decisions as to obscenity [i.e., *Roth v. United States,* 354 U.S. 476 (1957) and its progeny] or in accordance with the limits prescribed for dealing with some forms of communicative conduct in [*United States v. O'Brien,* 391 U.S. 367 (1968)]," 409 U.S.

---

[13] The second section of the Twenty-first Amendment provides that "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI, § 2.

at 116, reasoning " '[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.' " *Id.* at 117-18 (citation omitted). The Court found that "the substance of the regulations struck down prohibits licensed bars or night-clubs from displaying, either in the form of movies or live entertainment, 'performances' that partake more of gross sexuality than of communication." *Id.* at 118. The Court also concluded that although "at least some of the performances to which these regulations address them-selves are within the limits of the constitutional protec-tion of freedom of expression, the critical fact is that Cali-fornia has not forbidden these performances across the board . . . [but] has merely proscribed such performances in establishments that it licenses to sell liquor by the drink." *Id.* The *LaRue* Court ended its analysis by noting that "[t]he Department's conclusion, embodied in these regulations, that certain sexual performances and the dispensation of liquor by the drink ought not to occur at premises that have licenses was not an irrational one," and that "[g]iven the added presumption in favor of the validity of the state regulation in this area that the Twenty-first Amendment requires, we cannot hold that the regula-tions on their face violate the Federal Constitution." *Id.* at 118-19.[14]

---

[14] *See also City of Newport v. Iacobucci*, 479 U.S. 92, 95 (1986) (upholding the constitutionality of a city ordinance prohibiting nude or nearly nude dancing in local establishments licensed to sell liquor for consumption on the premises); *New York State Liquor Auth. v. Bellanca*, 452 U.S. 714, 717 (1981) (holding that "[t]he State's power to ban the sale of alcoholic beverages

(continued...)

**B.  *44 Liquormart, Inc. v. Rhode Island***

After the Supreme Court's decision in *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996), however, the precedential value of the reasoning anchoring the Court's holding in *LaRue* was severely diminished. In *44 Liquormart*, the Court held that Rhode Island's statutory prohibition against advertisements providing the public with accurate information about retail prices of alcoholic beverages was "an abridgement of speech protected by the First Amendment and that is not shielded from constitutional scrutiny by the Twenty-first Amendment." *Id.* at 489. In reaching this conclusion, the Court noted:

> Rhode Island argues, and the Court of Appeals agreed, that in this case the Twenty-first Amendment tilts the First Amendment analysis in the State's favor [of the advertising ban] . . . . [T]he Court of Appeals relied on our decision in *California v. LaRue* . . . [where] five Members of the Court relied on the Twenty-first Amendment *to* buttress the conclusion that the First Amendment did not invalidate California's prohibition of certain grossly sexual exhibitions in premises licensed to serve alcoholic beverages. Specifically, the opinion stated that the Twenty-first Amendment required that the prohibition be given an added pre-

---

[14] (...continued)
entirely includes the lesser power to ban the sale of liquor on premises where topless dancing occurs"); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932-33 (1975) (noting that under *LaRue* states may ban nude dancing as part of their liquor licensing programs); *City of Kenosha v. Bruno*, 412 U.S. 507, 515 (1973) (noting that "regulations prohibiting the sale of liquor by the drink on premises where there were nude but not necessarily obscene performances [are] facially constitutional").

sumption in favor of its validity. *We are now persuaded that the Court's analysis in LaRue would have led to precisely the same result if it had placed no reliance on the Twenty-first Amendment. Entirely apart from the Twenty-first Amendment, the State has ample power to prohibit the sale of alcoholic beverages in inappropriate locations. Moreover, in subsequent cases, the Court has recognized that the States' inherent police powers provide ample authority to restrict the kind of "bacchanalian revelries" described in the LaRue opinion regardless of whether alcoholic beverages are involved. . . . See, e.g., Young v. American Mini Theatres, Inc., 427 U.S. 50 (1976); Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991). As we recently noted: "LaRue did not involve commercial speech about alcohol, but instead concerned the regulation of nude dancing in places where alcohol was served." Rubin v. Coors Brewing Co., 514 U.S., at 483, n. 2. Without questioning the holding of LaRue, we now disavow its reasoning insofar as it relied on the Twenty-first Amendment.*

*Id.* at 515-16 (emphasis added).

The foregoing makes clear that *LaRue's* holding remains valid after *44 Liquormart*, but for a different reason. The *44 Liquormart* Court concluded that "the Court's analysis in *LaRue* would have led to precisely the same result if it had placed no reliance on the Twenty-first Amendment," 517 U.S. at 515, because "[e]ntirely apart from the Twenty-first Amendment, the State has ample power to prohibit the sale of alcoholic beverages in inappropriate locations." *Id.* In making this assertion, the *44 Liquormart* Court relied on the *LaRue* Court's conclusion that: "the States, vested as they are with general police power, require no specific grant of authority in the Federal Constitution to legislate with respect to matters traditionally within the scope of the police power . . . [i.e.,] the

normal state authority over public health, welfare, and morals." 409 U.S. at 114. But in recent years, the Supreme Court has held, on a number of occasions, that "non-obscene" adult entertainment is entitled to a minimal degree of protection under the First Amendment, even in relation to laws enacted pursuant to a State's general police powers. *City of Los Angeles v. Alameda Books, Inc.*, 122 S.Ct. 1728, 1739 (2002) (Kennedy, J., concurring) (noting that "if a city can decrease the crime and blight associated with [adult entertainment] speech by the traditional exercise of its zoning power, and at the same time leave the quantity and accessibility of speech substantially undiminished, there is no First Amendment objection"); *Pap's A.M.*, 529 U.S. at 296 (plurality opinion) (holding that city's public indecency ordinance, enacted to "protect public health and safety," must be analyzed as a content-neutral regulation of expressive conduct); *id.* at 310 (Souter, J., concurring in part and dissenting in part).

Given the foregoing, it is difficult to ascertain exactly what "analysis" the *44 Liquormart* Court was referring to as having persuaded it that the *LaRue* Court would have reached the same result even without the "added presumption" of the Twenty-first Amendment. We find noteworthy, however, the *44 Liquormart* Court's citation of the post-*LaRue* decisions of *Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976), and *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 582 (1991), in support of its assertion that "the States' inherent police powers provide ample authority to restrict the kind of 'bacchanalian revelries' described in the *LaRue* opinion regardless of whether alcoholic beverages are involved." *44 Liquormart*, 517 U.S. at 515. In *American Mini Theatres* and *Barnes*, the Supreme Court held that the adult entertainment regulations at issue were subject to intermediate scrutiny for purposes of determining their constitutionality under the First Amend-

ment. *American Mini Theatres*, 427 U.S. at 79 (Powell, J., concurring) ("it is appropriate to analyze the permissibility of Detroit's action [zoning ordinance separating adult theaters from residential neighborhoods and churches] under the four-part test of *United States v. O'Brien* . . . ."); *Barnes*, 501 U.S. at 582 (Souter, J., concurring) ("I also agree with the plurality that the appropriate analysis to determine the actual protection required by the First Amendment is the four-part enquiry described in *United States v. O'Brien* . . . .").

Like the Fourth and Eleventh Circuits, we conclude that after *44 Liquormart* state regulations prohibiting the sale or consumption of alcohol on the premises of adult entertainment establishments must be analyzed in light of *American Mini Theatres* and *Barnes*, as modified by their respective progeny. *See Giovani Carandola Ltd. v. Bason*, 303 F.3d 507, 513 n.2 & 519 (4th Cir. 2002) (noting the *44 Liquormart* Court's reliance on *American Mini Theatres* and *Barnes* and holding that "the result reached in *LaRue* remains sound not because a state enjoys any special authority when it burdens speech by restricting the sale of alcohol, but rather because the regulation in *LaRue* complied with the First Amendment"); *Sammy's of Mobile, Ltd. v. City of Mobile*, 140 F.3d 993, 996 (11th Cir. 1998) (holding that "the Supreme Court [in *44 Liquormart*] . . . reaffirmed the precedential value of *LaRue* and the *Barnes-O'Brien* test . . . . [and] reaffirmed that the *Barnes-O'Brien* intermediate level of review applies to [adult entertainment liquor regulations]"). *But see BZAPS, Inc. v. City of Mankato*, 268 F.3d 603, 608 (8th Cir. 2001) (upholding the constitutionality of an adult entertainment liquor regulation solely on the basis of *LaRue's* holding).

We reach this conclusion notwithstanding the fact that in *LaRue* the Supreme Court upheld the constitutionality of the adult entertainment liquor regulations using the ra-

tional basis test, *see* 409 U.S. at 115-16, and explicitly refused to subject the regulations to *O'Brien's* intermediate scrutiny test. *Id.* at 116 ("We do not believe that the state regulatory authority in this case was limited to . . . dealing with the problem it confronted . . . in accordance with the limits prescribed for dealing with some forms of communicative conduct in [*O'Brien*]"). We do so because the *44 Liquormart* Court's reference to *American Mini Theatres* and *Barnes* makes clear that the Court is of the opinion that adult entertainment liquor regulations, like the ones at issue in *LaRue*, will pass constitutional muster even under the heightened intermediate scrutiny tests outlined in those cases.

In making this determination, we are by no means suggesting that the Supreme Court's decisions in *American Mini Theatres* and *Barnes* are of greater precedential value than *LaRue*. On the contrary, as noted *infra*, our decision in this case is largely dictated by *LaRue's* holding. At the time *LaRue* was decided, however, the Supreme Court had not yet established a framework for analyzing the constitutionality of adult entertainment regulations. This changed with the Court's subsequent decisions in *American Mini Theatres* and *Barnes*, cases that serve as a point of origin for two distinct, yet overlapping, lines of jurisprudence that address the degree of First Amendment protection afforded to adult entertainment. Given the significant development of the law in this area since *LaRue*, as well as the Court's refashioning of *LaRue's* reasoning in *44 Liquormart*, we conclude that it is necessary to apply *LaRue's* holding in the context of this precedent.

### C.  The *44 Liquormart* "road map"

The *44 Liquormart* decision established a road map of sorts for analyzing the constitutionality of adult entertain-

ment liquor regulations, i.e., the Supreme Court's decisions in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976), and *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 582 (1991), providing two separate but similar routes.[15] First, the *American Mini Theatres* decision, as modified by the Court's subsequent decisions in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), and *City of Los Angeles v. Alameda Books, Inc.*, 122 S.Ct. 1728 (2002), delineates the standards for evaluating the constitutionality of *adult entertainment zoning ordinances*. Second, the *Barnes* decision, as modified by the Court's recent decision in *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000), provides guidelines for analyzing the constitutionality of *public indecency statutes*.

The analytical frameworks utilized in both lines of jurisprudence can be traced back to the four-part test enunciated by the Supreme Court in *United States v. O'Brien*, 391 U.S. 367 (1968), where the Court held that a statute prohibiting the destruction or mutilation of draft cards was a content-neutral regulation of expressive conduct. *Id.* at 376. *See also American Mini Theatres*, 427 U.S. at 79 (Powell, J., concurring) (applying *O'Brien* test); *Barnes*, 501 U.S. at 582 (Souter, J., concurring) (same). Under the *O'Brien* test, a governmental regulation is sufficiently justified, despite its incidental impact upon expressive conduct protected by the First Amendment, if: (1) it is within the constitutional power of the government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free speech; and (4) the incidental restriction on

---

[15] *See J & B Social Club No. 1, Inc. v. City of Mobile*, 966 F. Supp. 1131, 1136 (S.D. Ala. 1996) (Hand, J.).

alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *Id.* at 377.

While the *O'Brien* test is still utilized by the Supreme Court in analyzing the constitutionality of public inde- cency statutes, *see Pap's A.M.*, 529 U.S. at 289 (plurality opinion); *id.* at 310 (Souter, J., concurring in part and dissenting in part), the Court currently evaluates adult entertainment zoning ordinances as time, place, and man- ner regulations. *Alameda Books*, 122 S.Ct. at 1733 (plurality opinion); *id.* at 1741 (Kennedy, J., concurring); *Renton*, 475 U.S. at 46-47. A time, place, and manner regulation of adult entertainment will be upheld if it is "designed to serve a substantial government interest and . . . reasonable alter- native avenues of communication remain[ ] available." *Alameda Books*, 122 S.Ct. at 1734. Additionally, a time, place, and manner regulation must be justified without reference to the content of the regulated speech and nar- rowly tailored to serve the government's interest. *Schultz*, 228 F.3d at 845.[16]

---

[16] In *Renton*, the Supreme Court created some confusion as to the appropriate test for analyzing time, place, and manner regulations by asserting that "time, place, and manner regula- tions are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." 475 U.S. at 47. However, as we emphasized in *City of Watseka v. Illinois Pub- lic Action Council*, 796 F.2d 1547 (7th Cir. 1986), "[t]he Supreme Court does not always spell out the 'narrowly tailored' step as part of its standard for evaluating time, place, and manner restrictions." *Id.* at 1553. Moreover, a close examination of *Renton* reveals that the Court did consider whether the zoning ordinance at issue was narrowly tailored. 475 U.S. at 52 ("[t]he Renton ordinance is 'narrowly tailored' to affect only that category of theaters shown to produce the unwanted secondary

(continued...)

In this case, however, we are not dealing with a zoning ordinance or a public indecency statute. Instead, we are called upon to evaluate the constitutionality of an adult entertainment liquor regulation. Therefore, it is not entirely clear whether Section 5(b) should be analyzed as a time, place, and manner restriction or as a regulation of expressive conduct under *O'Brien's* four-part test; or for that matter whether the tests are entirely interchangeable. *See LLEH, Inc. v. Wichita County, Texas*, 289 F.3d 358, 365 (5th Cir.), *cert. denied*, 123 S.Ct. 621 (2002) (noting uncertainty as to which test courts should use in analyzing the constitutionality of adult entertainment regulations: "the test for time, place, or manner regulations, described in *Renton* . . . or the four-part test for incidental limitations on First Amendment freedoms, established in *O'Brien* . . . ."). For all practical purposes, however, the distinction is irrelevant because the Supreme Court has held that the time, place, and manner test embodies much of the same standards as those set forth in *United States v. O'Brien. Barnes*, 501 U.S. at 566 (plurality opinion) (relying on *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 298-99 (1984)); *LLEH*, 289 F.3d at 365-66 (same).[17] Moreover, as explained *infra*, two of the Su-

---

[16] (...continued)
effects . . . ."). In any event, both the Supreme Court and this circuit have continued to apply the "narrowly tailored" step to time, place, and manner regulations. *See Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989); *Frisby v. Schultz*, 487 U.S. 474, 481 (1987); *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 1000 (7th Cir. 2002).

[17] *But see Alameda Books*, 122 S.Ct at 1745 n.2 (Souter, J., dissenting) (joined by Stevens, J. and Ginsburg, J.) (noting that "[b]ecause *Renton* called its secondary-effects ordinance a mere,

(continued...)

preme Court's post-*44 Liquormart* decisions—*Pap's A.M.*
and *Alameda Books*—make it abundantly clear that the
analytical frameworks and standards utilized by the Court
in evaluating adult entertainment regulations, be they
zoning ordinances or public indecency statutes, are vir-
tually indistinguishable. We, therefore, conclude that it
is appropriate to analyze the constitutionality of Section
5(b) using the standards articulated by the Supreme Court
in the five decisions comprising the *American Mini Thea-
tres* and *Barnes* lines of jurisprudence. Thus, before pro-
ceeding to the merits of Ben's Bar's argument, we begin
our analysis by summarizing the reasoning and holdings
of these decisions.

### (1)  *Young v. American Mini Theatres, Inc.*

In *Young v. American Mini Theatres*, 427 U.S. 50 (1976), the
Supreme Court addressed, *inter alia*, whether a zoning
ordinance enacted by the City of Detroit violated the First
Amendment.[18] *Id.* at 58. The "dispersal" ordinance at issue
prohibited the operation of any adult entertainment movie

---

[17] (...continued)
time, place, or manner restriction and thereby glossed over the
role of content in secondary-effects zoning . . . I believe the
soft focus of its statement of the middle-tier test should be
rejected in favor of the . . . [*O'Brien*] formulation . . . a closer
relative of secondary effects zoning than mere time, place,
and manner regulations, as the Court . . . implicitly recognized
[in *Pap's A.M.*].").

[18] The Court also concluded that the zoning ordinance did not
violate the Due Process and Equal Protection Clauses of the
Fourteenth Amendment, *American Mini Theatres*, 427 U.S. at 61,
72-73; *see generally id.* at 73-84 (Powell, J., concurring), issues
that are not before us on appeal.

theater within 1,000 feet of any two other "regulated uses" (e.g., adult bookstores, bars, hotels, pawnshops), or within 500 feet of a residential area. *Id.* at 52. A majority of the Court upheld the constitutionality of the ordinance, but in doing so did not agree on a single rationale for the decision. *Id.* at 62-63 (plurality opinion); *id.* at 84 (Powell, J. concurring). The plurality concluded that "apart from the fact that the ordinance treats adult theaters differently from other theaters and the fact that the classification is predicated on the content of material shown in respective theaters, *the regulation of the place where such films may be exhibited does not offend the First Amendment.*" *Id.* at 63 (emphasis added). In reaching this conclusion, the plurality emphasized that "even though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate." *Id.* at 70. The plurality also found that the city's zoning ordinance was justified by its interest in "preserving the character of its neighborhoods," *id.* at 71, and therefore "the city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Id.* The plurality concluded its analysis by noting that "what is ultimately at stake is nothing more than a limitation on the place where adult films may be exhibited . . . ." *Id.*[19]

---

[19] The *American Mini Theatres* plurality also noted, in a footnote, that the city had enacted the zoning ordinance because of its determination that "a concentration of 'adult' movie theaters causes the area to deteriorate and become a focus of crime, *effects* which are not attributable to theaters showing other types

(continued...)

Justice Powell concurred in the judgment of the Court, agreeing with the plurality that the zoning ordinance "is addressed only to the places at which this type of expression may be presented, a restriction that does not interfere with content." *Id.* at 78-79. He disagreed, however, with the plurality's determination that "nonobscene, erotic materials may be treated differently under First Amendment principles from other forms of protected expression." *Id.* at 73 n.1. Instead, Justice Powell concluded that it was appropriate to analyze and uphold the constitutionality of the zoning ordinance under the four-part test enunciated in *United States v. O'Brien*, 391 U.S. 367 (1968). *Id.* at 79.[20]

### (2) *City of Renton v. Playtime Theatres, Inc.*

The Supreme Court's decision in *American Mini Theatres* laid the groundwork for the Court's decision in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).[21] In

---

[19] (...continued)
of films," 427 U.S. at 71 n.34 (emphasis added), noting "[i]t is this *secondary effect* which these zoning ordinances attempt to avoid, not the dissemination of 'offensive' speech." *Id.* (emphasis added).

[20] Under *Marks v. United States*, 430 U.S. 188, 193 (1977), Justice Powell's concurrence is the controlling opinion in *American Mini Theatres*, as the most narrow opinion joining four other Justices in the judgment of the Court. *Entertainment Concepts, Inc., III v. Maciejewski*, 631 F.2d 497, 504 (7th Cir. 1980).

[21] Falling in between *American Mini Theatres* and *Renton* is the Supreme Court's decision in *Schad v. Borough Mount Ephraim*, 452 U.S. 61 (1981), where the Court struck down, on First
(continued...)

*Renton,* the Court considered the validity of an adult entertainment zoning ordinance virtually indistinguishable from the one at issue in *American Mini Theatres. Id.* at 46. Unlike the *American Mini Theatres* plurality, however, the *Renton* Court outlined an analytical framework for evaluating the constitutionality of these ordinances. The Court's analysis proceeded in three steps. First, the Court found that the ordinance did not ban adult theaters altogether, but merely required that they be distanced from certain sensitive locations. *Id.* Next, the Court considered whether the ordinance was content-neutral or content-based. If an ordinance is content-based, it is presumptively invalid and subject to strict scrutiny. *Id.* at 46-47. On the other hand, if an ordinance is aimed not at the content of the films shown at adult theaters, but rather at combating the secondary effects of such theaters on the surrounding community (e.g., increased crime rates, diminished property values), it will be treated as a content-neutral regulation. *Id.* In *Renton,* the Court held that the zoning ordinance was a "content neutral" regulation of speech because while

---

[21] (...continued)
Amendment grounds, a zoning ordinance that did not—like the ordinance in *American Mini Theatres*—require the dispersal of adult theaters, but instead prohibited them altogether. *Id.* at 71-72 (plurality opinion); *id.* at 77 (Blackmun, J., concurring); *id.* at 79 (Powell, J., concurring). The only significance of *Schad,* for purpose of our analysis, is that the holding of that case serves as the basis for the first step in the *Renton* framework—i.e., does the ordinance completely prohibit the expressive conduct at issue? *See Alameda Books,* 122 S.Ct. at 1733 (noting that the first step in the *Renton* framework was the Court's determination that "the ordinance did not ban adult theaters altogether, but merely required that they be distanced from certain sensitive locations"); *Renton,* 475 U.S. at 46.

"the ordinance treats theaters that specialize in adult films differently from other kinds of theaters . . . . [it] is aimed not at the *content* of the films shown . . . but rather at the *secondary effects* of such theaters on the surrounding community." 475 U.S. at 47. Finally, given this finding, the *Renton* Court found that the zoning ordinance would be upheld as a valid time, place and manner regulation, *id.* at 46, if it "was designed to serve a substantial governmental interest and [did] not unreasonably limit alternative avenues of communication." *Id.* at 47. The Court concluded that the zoning ordinance met this test, noting that a " 'city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect.' " *id.* at 50 (quoting *American Mini Theatres*, 427 U.S. at 71),[22] and that the ordinance allowed for reasonable alternative avenues of communication because there was "ample, accessible real estate" open for use as adult theater sites. *Id.* at 53.

The Supreme Court's decision in *Renton* is also notable because in addition to upholding the constitutionality of the zoning ordinance, the Court also held that the First Amendment did not require municipalities, before enacting such ordinances, to conduct new studies or produce evidence independent of that already generated by other cities (whether summarized in judicial decisions or not), *Renton*, 475 U.S. at 51-52, so long as "whatever evidence [a] city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Id.*

---

[22] *See also American Mini Theatres*, 427 U.S. at 80 (Powell, J., concurring) ("Nor is there doubt that the interests furthered by this ordinance are both important and substantial").

**(3)** *Barnes v. Glen Theatre, Inc.*

In *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991), the Supreme Court was called upon to address the constitutionality of Indiana's public indecency statute. In a splintered decision, a narrow majority of the Court held that the statute—which prohibited nudity in public places—could be enforced against establishments featuring nude dancing, i.e., by requiring dancers to wear pasties and G-strings during their performances, without violating the First Amendment's right of free expression. *Id.* at 565 (plurality opinion); *id.* at 572 (Scalia, J. concurring); *id.* at 582, 585 (Souter, J. concurring). Of that majority, however, only three Justices agreed on a single rationale.

The plurality—Chief Justice Rehnquist and Justices O'Connor and Kennedy—began its analysis by emphasizing that while "nude dancing . . . is expressive conduct within the outer perimeters of the First Amendment . . . . [w]e must [still] determine the level of protection to be afforded to the expressive conduct at issue, and . . . whether the Indiana statute is an impermissible infringement of that protected activity." *Barnes*, 501 U.S. at 566. The plurality noted that the public indecency statute did not "ban[ ] nude dancing, as such, but . . . proscribed public nudity across the board," *id.*, and that "the Supreme Court of Indiana has construed the Indiana statute to preclude nudity in what are essentially places of public accommodation." *Id.* Next, the plurality concluded that the public indecency statute should be analyzed under *O'Brien's* four-part test for evaluating regulations of expressive conduct protected by the First Amendment.[23] Applying this

---

[23] In doing so, the *Barnes* plurality noted that the *O'Brien* test and the time, place, and manner test utilized by the Court

(continued...)

test, the plurality found "that Indiana's public indecency statute [was] justified despite its incidental limitations on some expressive activity," *id.* at 567, because: (1) the statute was "clearly within the constitutional power of the State and furthers substantial governmental interests [i.e., protecting societal order and morality]," *id.* at 568; (2) the state's interest in protecting societal order and morality by enforcing the statute to prohibit nude dancing was "unrelated to the suppression of free expression" because "the requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic [and] [t]he perceived evil that Indiana seeks to address is not erotic dancing, but public nudity," *id.* at 570-71; (3) the incidental restriction on First Amendment freedom placed on nude dancing by the statute was no greater than essential to the furtherance of the governmental interest because "[t]he statutory prohibition is not a means to some greater end, but an end in itself," *id.* at 571-72; and (4) the public indecency statute was narrowly tailored because "Indiana's requirement that the dancers wear pasties and G-strings is modest, and the *bare minimum necessary to achieve the State's purpose.*" *Id.* at 572 (emphasis added).

Justice Scalia concurred in the judgment of the Court, but in doing so expressed his opinion that "the challenged regulation must be upheld not because it survives some lower level of First Amendment scrutiny, but because, as a general law regulating conduct and not specifically directed at expression, it is not subject to First Amendment

---

[23] (...continued)
in *Renton* have "been interpreted to embody much the same standards . . . ." 501 U.S. at 566.

scrutiny at all." *Id.* at 572. Justice Souter also concurred in the judgment of the Court, agreeing with the plurality that "the appropriate analysis to determine the actual protection required by the First Amendment is the four-part inquiry described in *United States v. O'Brien." Id.* at 582. He wrote separately, however, to rest his concurrence in the judgment, "not on the possible sufficiency of society's moral views to justify the limitations at issue, but on the State's substantial interest in combating the secondary effects of adult entertainment establishments . . . ." *Id.*[24] In doing so, Justice Souter relied heavily on the Court's decision in *Renton. Id.* at 583-87.

**(4)  *City of Erie v. Pap's A.M.***

The Supreme Court revisited the *Barnes* holding in *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000), where a majority of the Court upheld the constitutionality of a public indecency ordinance "strikingly similar" to the one at issue in *Barnes. Id.* at 283. Unlike *Barnes*, however, in *Pap's A.M.* five justices agreed that the proper framework for analyzing public indecency statutes was *O'Brien's* four-part test. *Id.* at 289 (plurality opinion) ("We now clarify that government restrictions on public nudity . . . should be evaluated under the framework set forth in *O'Brien* for content-neutral restrictions on symbolic speech"); *id.* at 310 (Souter, J., concurring in part and dissenting in part) (agreeing with the "analytical approach that the plurality employs in deciding this case [i.e., the *O'Brien* test]"). *See*

---

[24] Under *Marks*, 430 U.S. at 193, Justice Souter's concurrence is the controlling opinion in *Barnes*, as the most narrow opinion joining the judgment of the Court. *Schultz*, 228 F.3d at 842 n.2; *DiMa Corp.*, 185 F.3d at 830.

*also Ranch House, Inc. v. Amerson*, 238 F.3d 1273, 1278 (11th Cir. 2001) (holding that "[a]lthough no opinion in [*Pap's A.M.*] was joined by more than four Justices, a majority of the Court basically agreed on how these kinds of statutes should be analyzed [i.e., *O'Brien*'s four-part test]"). A majority of the Justices also agreed that combating the adverse secondary effects of nude dancing was within the city's constitutional powers and unrelated to the suppression of free expression, *Pap's A.M.*, 529 U.S. at 296, 301 (plurality opinion) ("Erie's efforts to protect public health and safety are clearly within the city's police powers . . . . [and] [t]he ordinance is unrelated to the suppression of free expression . . . ."); *id.* at 310 (Souter, J., concurring in part and dissenting in part) ("Erie's stated interest in combating the secondary effects associated with nude dancing establishments is an interest unrelated to the suppression of expression . . . ."), thus satisfying the first and third prongs of the *O'Brien* test.

A majority of the Justices in *Pap's A.M.* could not, however, agree on whether the public indecency statute furthered an important or substantial interest of the city (second prong of *O'Brien*), and if so whether the incidental restriction on nude dancing was no greater than that essential to the furtherance of this interest (fourth prong). The plurality—Chief Justice Rehnquist and Justices O'Connor, Kennedy, and Breyer—concluded that Erie's public indecency ordinance furthered an important or substantial government interest under *O'Brien* because "[t]he asserted interests of regulating conduct through a public nudity ban and of combating the harmful secondary effects associated with nude dancing [e.g., the increased crime generated by such establishments] are undeniably

important." *Pap's A.M.*, 529 U.S. at 296.[25] The *Pap's A.M.* plurality also found that Erie's public indecency statute was no greater than that essential to furthering the city's interest in combating the harmful secondary effects of nude dancing because:

> The ordinance regulates conduct, and any incidental impact on the expressive element of nude dancing is *de minimis.* The requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message.

529 U.S. at 301.

Justice Scalia, joined by Justice Thomas, agreed with the plurality that the ordinance should be upheld, but wrote separately to emphasize that " 'as a general law regulating conduct and not specifically directed at expression, [the city's public indecency ordinance] is not subject to First Amendment scrutiny at all,' " *Pap's A.M.*, 529 U.S. at 307-08 (quoting *Barnes*, 501 U.S. at 572 (Scalia, J., concurring)), and that "[t]he traditional power of government to foster good morals (*bonos mores*), and the acceptability of the traditional judgment (if Erie wishes to endorse it) that nude public dancing *itself* is immoral, have not been repealed by the First Amendment." *Id.* at 310. Justice Souter con-

---

[25] The *Pap's A.M.* plurality's reliance on *Renton's* secondary effects doctrine is significant because it marks a departure from the *Barnes* plurality's determination that a public indecency ordinance may be justified by a State's interest in protecting societal order and morality, *Barnes*, 501 U.S. at 568, and an adoption of the approach advocated by Justice Souter in his concurrence in that case. *Id.* at 582.

curred in part and dissented in part, stressing his belief that "the current record [does not] allow us to say that the city has made a sufficient evidentiary showing to sustain its regulation . . . ." *Id.* at 310-11. Justice Stevens, joined by Justice Ginsburg, dissented, asserting that the ordinance was a "patently invalid" content-based ban on nude dancing that censored protected speech. *Id.* at 331-32. Because the plurality's decision offers the narrowest ground for the Supreme Court's holding in *Pap's A.M.,* we find the reasoning of that opinion to be controlling. *Marks,* 430 U.S. at 193.

### (5)  *City of Los Angeles v. Alameda Books, Inc.*

This past term in *City of Los Angeles v. Alameda Books, Inc.,* 122 S.Ct. 1728 (2002), the Supreme Court upheld, at the summary judgment stage, an ordinance prohibiting multiple adult entertainment businesses from operating in the same building. *Id.* at 1733. The Court reached this conclusion despite the fact that the city had not, prior to the enactment of the ordinance, conducted or relied upon studies (or other evidence) specifically demonstrating that forbidding multiple adult entertainment businesses from operating under one roof reduces secondary effects. *Id.* at 1736 (plurality opinion); *id.* at 1744 (Kennedy, J., concurring). Once again, however, a majority of the Court could not agree on a single rationale for this decision.

The primary issue in *Alameda Books* was the appropriate standard "for determining whether an ordinance serves a substantial government interest under *Renton.*" 122 S.Ct. at 1733. The plurality—written by Justice O'Connor and joined by Chief Justice Rehnquist and Justices Scalia and Thomas—concluded that whether a municipal ordinance is " 'designed to serve a substantial government

interest and does not unreasonably limit alternative avenues of communication' . . . requires [courts to] . . . ask[ ] whether the municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance." *Id.* at 1737. According to the plurality, this requirement is met if the evidence upon which the municipality enacted the regulation " 'is reasonably believed to be relevant' for demonstrating a connection between [secondary effects producing] speech and a substantial, independent government interest." *Id.* at 1736. The plurality stressed that once a municipality presents a rational basis for addressing the secondary effects of adult entertainment through evidence that "fairly support[s] the municipality's rationale for its ordinance," *id.*, the plaintiff challenging the constitutionality of the ordinance must "cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings." *Id.* If a plaintiff fails to cast doubt on the municipality's rationale, the inquiry is over and "the municipality meets the standard set forth in *Renton.*" *Id.* If, however, a plaintiff succeeds "in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance." *Id.* Because the plurality concluded that the city, for purposes of summary judgment, had complied with the evidentiary requirement outlined in *Renton, id.,* it remanded the case for further proceedings. *Id.* at 1738.

Justice Scalia, in addition to joining the plurality opinion, wrote separately to emphasize that while the plurality's opinion "represents a correct application of our jurisprudence concerning the regulation of the 'secondary effects' of pornographic speech . . . . our First Amendment tradi-

tions make 'secondary effects' analysis quite unnecessary. The Constitution does not prevent those communities that wish to do so from regulating, or indeed entirely suppressing, the business of pandering sex." *Alameda Books,* 122 S.Ct. at 1738-39.

Justice Kennedy concurred in the judgment of the Court, but writing separately because he concluded, *inter alia,* that "the plurality's application of *Renton* might constitute a subtle expansion, with which I do not concur." *Id.* at 1739. He began, however, by expressing his agreement with the plurality that the secondary effects resulting from "high concentrations of adult businesses can damage the value and integrity of a neighborhood," *id.,* stressing "[t]he damage is measurable; it is all too real." *Id.* He also agreed with the plurality that "[t]he law does not require a city to ignore these consequences if it uses its zoning power in a reasonable way to ameliorate them without suppressing speech," *id.,* emphasizing that "[a] city's 'interest in attempting to preserve the quality of urban life is one that must be accorded high respect.'" *Id.* (quoting *American Mini Theatres,* 427 U.S. at 71). In Justice Kennedy's opinion, if a municipality ameliorates the secondary effects of adult entertainment through "the traditional exercise of its zoning power, and at the same time leaves the quantity and accessibility of the speech substantially undiminished, there is no First Amendment objection . . . . even if the measure identifies the problem outside by reference to the speech inside—that is, even if the measure is in that sense content based."[26] *Id.* Like

---

[26] The plurality in *Alameda Books* characterized the second step of the *Renton* framework as follows: "[w]e next consider[ ] whether the ordinance [is] content neutral or content based." 122

(continued...)

the plurality, he concluded that "[a] zoning law need not be blind to the secondary effects of adult speech, so long as the purpose of the law is not to suppress it." *Id.* at 1740. He also expressed his belief that zoning regulations "do not automatically raise the specter of impermissible content discrimination, even if they are content based, because they have a prima facie legitimate purpose: to limit the negative externalities of land use . . . [and that] [t]he zoning context provides a built-in legitimate rationale, which rebuts the usual presumption that content-based restrictions are unconstitutional." *Id.* at 1741.

Based on the foregoing principles, Justice Kennedy believes that two questions must be asked by a court seeking to determine whether a zoning ordinance regulating adult entertainment is designed to meet a substantial

---

[26] (...continued)
S.Ct. at 1734. In his concurrence, Justice Kennedy joined the four dissenters, *id.* at 1744-45, in jettisoning the "content neutral" label, noting that the "fiction" of adult entertainment zoning ordinances being "content neutral . . . is perhaps more confusing than helpful . . . . These ordinances are content based and we should call them so." *Id.* at 1741. In reaching this conclusion, Justice Kennedy emphasized that "whether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *Id.* Justice Kennedy concluded, however, that an adult entertainment zoning ordinance is not subject to strict scrutiny simply because it "identifies the problem outside by reference to the speech inside," *id.* at 1740, and, as such, "the central holding of *Renton* is sound: A zoning restriction that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny." *Id.* at 1741. Thus, while the label has changed, the substance of *Renton's* second step remains the same.

government interest: (1) "what proposition does a city need to advance in order to sustain a secondary-effects ordinance?", *Alameda Books*, 122 S.Ct at 1741; and (2) "how much evidence is required to support the proposition?" *Id.* According to Justice Kennedy, the plurality skipped the second question, giving the correct answer, but neglected to give sufficient "attention" to the first question, *id.*, i.e., "the claim a city must make to justify a content-based ordinance." *Id.* at 1742. In his view, "a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact," *id.*, and "[t]he rationale of the ordinance must be that it will suppress secondary effects . . . not . . . speech." *Id.* Justice Kennedy's primary area of disagreement with the plurality's analysis was that, in his opinion, it failed to "address how speech [would] fare under the city's ordinance." *Id.*

The differences between Justice Kennedy's concurrence and the plurality's opinion are, however, quite subtle. Justice Kennedy's position is not that a municipality must *prove* the efficacy of its rationale for reducing secondary effects *prior to* implementation, as Justice Souter and the other dissenters would require, *see generally Alameda Books*, 122 S.Ct at 1744-51; but that a municipality's *rationale* must be *premised* on the theory that it "*may* reduce the costs of secondary effects without substantially reducing speech." *Id.* at 1742 (emphasis added). Significantly, while Justice Kennedy believed that the plurality did not adequately address this aspect of the city's rationale, he agreed with the plurality's overall conclusion that a municipality's initial burden of demonstrating a substantial government interest in regulating the adverse secondary effects associated with adult entertainment is slight, noting:

> As to this, we have consistently held that a city must have latitude to experiment, at least at the outset, and that very little evidence is required . . . . As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners. The Los Angeles City Council knows the streets of Los Angeles better than we do. It is entitled to rely on that knowledge; *and if its inferences appear reasonable*, we should not say there is no basis for its conclusion.

*Id.* at 1742-43 (emphasis added).

The dissenting opinion of Justice Souter, joined by Justices Stevens and Ginsburg in full and by Justice Breyer with respect to part II, asserted that the Court should have struck down the ordinance. *Alameda Books*, 122 S.Ct. at 1747 (Souter, J., dissenting).

Because Justice Kennedy's concurrence is the narrowest opinion joining the judgment of the Court in *Alameda Books*, we conclude that it is the controlling opinion. *Marks*, 430 U.S. at 193.


### D. Does Section 5(b)'s prohibition of alcohol on the premises of Sexually Oriented Businesses violate the First Amendment?

Based on the road map provided by the Supreme Court in *44 Liquormart*, as described *supra*, we conclude that a liquor regulation prohibiting the sale or consumption of alcohol on the premises of adult entertainment establishments is constitutional if: (1) the State is regulating pursuant to a legitimate governmental power, *O'Brien*, 391 U.S. at 377; (2) the regulation does not completely prohibit adult entertainment, *Renton*, 475 U.S. at 46; (3) the regula-

tion is aimed not at the suppression of expression, but rather at combating the negative secondary effects caused by adult entertainment establishments, *Pap's A.M.*, 529 U.S. at 289-91;[27] and (4) the regulation is designed to serve a substantial government interest, narrowly tailored, and reasonable alternative avenues of communication remain available, *see Alameda Books*, 122 S.Ct. at 1734 (plurality opinion); *id.* at 1739-44 (Kennedy, J. concurring); <u>or</u>, alternatively, the regulation furthers an important or substantial government interest and the restriction on expressive conduct is no greater than is essential in furtherance of that interest. *Pap's A.M.*, 529 U.S. at 296, 301 (plurality opinion); *id.* at 310 (Souter, J., concurring in part and dissenting in part).

Applying the foregoing analytical framework here, we conclude that Section 5(b) does not violate the First Amendment. To begin with, the Village's regulation of alcohol sales and consumption in "inappropriate locations" is clearly within its general police powers. *44 Liquormart*, 517 U.S. at 515; *LaRue*, 409 U.S. at 114. As such, the Village enacted Section 5(b) "within the constitutional power of the Government." *Pap's A.M.*, 529 U.S. at 296 (holding that a municipality's efforts to protect the public's health and safety through its general police powers satisfies this requirement); *O'Brien*, 391 U.S. at 377 (same).

The next two prongs of our test concern the level of constitutional scrutiny that must be applied to Section 5(b).

---

[27] This prong is, for all practical purposes, identical to the *Alameda Books* plurality's inquiry into whether the zoning ordinance "was content neutral or content based." 122 S.Ct. at 1733-34. Although a majority of the Justices no longer employ the content neutral label when evaluating the constitutionality of a "secondary effects" ordinance, the ultimate inquiry remains the same. *See supra* n.26.

The level of First Amendment scrutiny a court uses to determine whether a regulation of adult entertainment is constitutional depends on the purpose for which the regulation was adopted. If the regulation was enacted to restrict certain viewpoints or modes of expression, it is presumptively invalid and subject to strict scrutiny. *Texas v. Johnson*, 491 U.S. 397, 403, 411-12 (1989); *Renton*, 475 U.S. at 46-47. If, on the other hand, the regulation was adopted for a purpose unrelated to the suppression of expression—e.g., to regulate nonexpressive conduct or the time, place, and manner of expressive conduct—a court must apply a less demanding intermediate scrutiny. 491 U.S. at 406-07; *Pap's A.M.*, 529 U.S. at 289 (plurality opinion); *id.* at 310 (Souter, J., concurring in part and dissenting in part).

The Supreme Court has held that regulations of adult entertainment receive intermediate scrutiny if they are designed not to suppress the "content" of erotic expression, but rather to address the negative secondary effects caused by such expression. *Alameda Books*, 122 S.Ct. at 1733-34 (plurality opinion), *id.* at 1741 (Kennedy, J., concurring); *Renton*, 475 U.S. at 48. Here, Section 5(b), like the liquor regulations at issue in *LaRue*, 409 U.S. at 118, does not completely prohibit Ben's Bar's dancers from conveying an erotic message; it merely prohibits alcohol from being sold or consumed on the premises of adult entertainment establishments. *See, e.g., Wise Enterprises, Inc. v. Unified Gov't of Athens-Clarke County, Georgia*, 217 F.3d 1360, 1365 (11th Cir. 2000) (holding that "[t]he ordinance does not prohibit all nude dancing, but only restricts nude dancing in those locations where the unwanted secondary effects arise"); *Sammy's of Mobile, Ltd. v. City of Mobile*, 140 F.3d 993, 998 (11th Cir. 1998) (holding that ordinance prohibiting alcohol on the premises of adult entertainment establishments did not ban nude dancing, but merely restricted "the place or manner of nude danc-

ing without regulating any particular message it might convey"). Moreover, it is clear that the "predominant concerns" motivating the Village's enactment of Section 5(b) " 'were with the secondary effects of adult [speech], and not with the content of adult [speech].' " *Alameda Books*, 122 S.Ct. at 1737 (plurality opinion) (quoting *Renton*, 475 U.S. at 47); *id.* at 1739-41 (Kennedy, J., concurring).[28] The Village enacted the Ordinance because it believed "there is convincing documented evidence that Sexually Oriented Businesses have a deleterious effect on both existing businesses around them and the surrounding residential areas adjacent to them, causing increased crime and the downgrading of property values." Specifically, the Village concluded that "the consumption of alcoholic beverages on the premises of a Sexually Oriented Business exacerbates the deleterious secondary effects of such businesses on the community." Additionally, in passing the Ordinance, the Village emphasized (in the text of the Ordinance) that its intention was not "to suppress any speech activities protected by the First Amendment, but to enact a[n] . . . ordinance which addresses the secondary effects of Sexually Oriented Businesses," and that it was not attempting to "restrict or deny access by adults to sexually oriented-materials protected by the First Amendment . . . ."

For all of the foregoing reasons, Section 5(b) is properly analyzed as a content-based time, place, and manner

---

[28] Federal courts evaluating the "predominant concerns" behind the enactment of a statute, ordinance, regulation, or the like, may do so by examining a wide variety of materials including, but not limited to, the text of the regulation or ordinance, any preamble or express legislative findings associated with it, and studies and information of which legislators were clearly aware. *Ranch House*, 238 F.3d at 1280.

restriction, or as a content-based regulation of expressive conduct, and therefore is subject only to intermediate scrutiny. *Alameda Books*, 122 S.Ct. at 1733-36 (plurality opinion), *id.* at 1741 (Kennedy, J. concurring); *Pap's A.M.*, 529 U.S. at 294-96 (plurality opinion), *id.* at 310 (Souter, J., concurring in part and dissenting in part).[29] *See also Artistic Entm't, Inc. v. City of Warner Robins*, 223 F.3d 1306, 1308-09 (11th Cir. 2000) (holding that "a prohibition on the sale of alcohol at adult entertainment venues . . . [is] content-neutral and subject to the *O'Brien* test"); *Wise Enterprises*, 217 F.3d at 1364 (holding that "[i]t is clear from these [legislative] statements the County's ordinance is aimed at the secondary effects of nude dancing combined with the consumption of alcoholic beverages, not at the message conveyed by nude dancing . . . . [T]he district court was [therefore] correct in [applying] . . . intermediate scrutiny . . . ."). Regulations that prohibit nude dancing where alcohol is served or consumed are independent of expressive or communicative elements of conduct, and therefore are treated as if they were content-neutral. *Wise Enterprises*, 217 F.3d at 1363.

This brings us to the heart of our analysis: whether Section 5(b) is designed to serve a substantial government interest, narrowly tailored, and does not unreasonably limit alternative avenues of communication, *or*, alterna-

---

[29] *Compare G.Q. Gentlemen's Quarters, Inc. v. City of Lake Ozark, Missouri*, 83 S.W.3d 98, 103 (Mo. Ct. App. 2002) (holding that because the city presented no evidence that its purpose in enacting an ordinance restricting nudity in establishments where alcoholic beverages are sold "was to prevent the negative secondary effects associated with erotic dancing establishments, and, thus, that the ordinance was unrelated to the suppression of expression, the City had the heavy burden of justifying the ordinance under the strict scrutiny standard").

tively, furthers an important or substantial government interest and the restriction on expressive conduct is no greater than is essential in furtherance of that interest. As previously noted, it is not entirely clear whether an adult entertainment liquor regulation is to be treated as a time, place, and manner regulation, or instead as a regulation of expressive conduct under *O'Brien. See, e.g., LLEH, Inc.,* 289 F.3d at 365. But in either case, we are required to ask "whether the municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance." *Alameda Books,* 122 S.Ct. at 1737 (plurality opinion). At this stage, courts must "examine evidence concerning regulated speech and secondary effects." *Id.* In conducting this inquiry, we are required, as previously noted, to answer two questions: (1) "what proposition does a city need to advance in order to sustain a secondary-effects ordinance?"; and (2) "how much evidence is required to support the proposition?" *Id.* at 1741 (Kennedy, J. concurring).[30]

At the outset, we note that in order to justify a content-based time, place, and manner restriction or a content-based regulation of expressive conduct, a municipality "must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects [i.e., is designed to serve, or furthers, a substantial or important governmental interest], while leaving the quantity and accessibility of speech substantially intact [i.e., that the regulation is narrowly tailored and does not unrea-

---

[30] As noted *supra,* under *Marks v. United States,* 430 U.S. 188 (1977), Justice Kennedy's concurrence is the controlling opinion, as the most narrow opinion joining the judgment of the Court.

sonably limit alternative avenues of communication, or, alternatively, that the restriction on expressive conduct is no greater than is essential in furtherance of that interest]."[31] *Alameda Books*, 122 S.Ct at 1741 (Kennedy, J. concurring). The regulation may identify the speech based on content, "but only as a shorthand for identifying the secondary effects outside." *Id.* A municipality "may not assert that it will reduce secondary effects by reducing speech in the same proportion." *Id.* Thus, the rationale behind the enactment of Section 5(b) must be that it will suppress secondary effects, not speech. *Id.*

The Village's rationale in support of Section 5(b) is that the liquor prohibition will significantly reduce the secondary effects that naturally result from combining adult entertainment with the consumption of alcoholic beverages without substantially diminishing the availability of adult entertainment, in this case nude and semi-nude dancing. In enacting the Ordinance, the Village Board relied on numerous judicial decisions, studies from 11 different cities, and "findings reported in the Regulation of Adult Entertainment Establishments of St. Croix, Wisconsin; and the Report of the Attorney General's Working Group of Sexually Oriented Businesses (June 6, 1989, State of Minnesota)," to support its conclusion that adult entertainment produces adverse secondary effects.

---

[31] In this case, it is unnecessary to conclusively resolve which of these two standards is applicable. As explained *infra*, Section 5(b)'s alcohol prohibition is, as a practical matter, the least restrictive means of furthering the Village's interest in combating the secondary effects resulting from the combination of adult entertainment and alcohol consumption, and therefore satisfies either standard.

Ben's Bar argues that the Village may not rely on prior judicial decisions or the experiences of other municipalities, but must instead conduct its own studies, at the local level, to determine whether adverse secondary effects result when liquor is served on the premises of adult entertainment establishments. This view, however, has been expressly (and repeatedly) rejected by the Supreme Court. *Alameda Books*, 122 S.Ct. at 1743 (Kennedy, J. concurring) (holding that " '[t]he First Amendment does not require a city, before enacting . . . an [adult entertainment secondary effects] ordinance to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.' ") (quoting *Renton*, 475 U.S. at 51-52); *Barnes*, 501 U.S. at 584 (Souter, J. concurring) (same).

Ben's Bar also contends that the Village failed to meet its burden of demonstrating the constitutionality of Section 5(b) because "the Village's evidentiary record did not include any written reports relating specifically to the effects of serving alcohol in establishments offering nude and semi-nude dancing." In *LaRue*, however, the Supreme Court explicitly held that a State's conclusion that "certain sexual performances and the dispensation of liquor by the drink ought not to occur at premises that have licenses was not an irrational one." 409 U.S. at 118. Because the adult entertainment at issue in this case is of the same character as that at issue in *LaRue*, it was entirely reasonable for the Village to conclude that barroom nude dancing was likely to produce adverse secondary effects at the local level, even in the absence of specific studies on the matter. *Alameda Books*, 122 S.Ct. at 1736-37 (plurality opinion) (adopting view of plurality in *Pap's A.M.* as to the evidentiary requirement for adult entertainment cases), *id.* at 1741 (Kennedy, J., concurring) (agreeing with

the plurality on this point, as a fifth vote); *Pap's A.M.*, 529 U.S. at 296-97 (plurality opinion) (same); *Giovani*, 303 F.3d at 516 (same). In fact, the Supreme Court has gone so far as to assert that "[c]ommon sense indicates that any form of nudity coupled with alcohol in a public place begets undesirable behavior." *Bellanca*, 452 U.S. at 718. *See also Blue Canary*, 251 F.3d at 1124 (noting that "[l]iquor and sex are an explosive combination"); *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd. of California*, 121 Cal. Rptr. 2d 729, 737 (Cal. Ct. App. 2002) (same). For these reasons, we conclude that the evidentiary record fairly supports the Village's proffered rationale for Section 5(b), and that Ben's Bar has failed "to cast direct doubt on this rationale either by demonstrating the [Village's] evidence does not support its rationale or by furnishing evidence that disputes the [Village's] factual findings . . . ." *Alameda Books*, 122 S.Ct. at 1736.

Ben's Bar also contends that Section 5(b) is not narrowly tailored because the Village offered no evidence that "the incidental restrictions placed on Ben's [Bar], over and above the pasties and G-strings requirement, ameliorate any purported negative secondary effects." This argument, however, is problematic for several reasons, two of which we will address briefly.

First, as previously noted, Section 5(b) does not impose any restrictions whatsoever on a dancer's ability to convey an erotic message. Instead, the regulation prohibits Sexually Oriented Businesses like Ben's Bar from serving alcoholic beverages to its patrons during a dancer's performance. This is not a restriction on erotic expression, but a prohibition of nonexpressive conduct (i.e., serving and consuming alcohol) during the presentation of expressive conduct. The First Amendment does not entitle Ben's Bar, its dancers, or its patrons, to have alco-

hol available during a "presentation" of nude or semi-nude dancing. *See Gary v. City of Warner Robins, Georgia*, 311 F.3d 1334, 1340 (11th Cir. 2002) (holding that ordinance prohibiting persons under the age of 21 from entering or working at "any establishment . . . which sells alcohol by the drink for consumption on premises" did not violate an underage nude dancer's First Amendment right to free expression because she "remains free to observe and engage in nude dancing, but she simply cannot do so . . . in establishments that primarily derive their sales from alcoholic beverages consumed on the premises"); *Sammy's of Mobile*, 140 F.3d at 999 (holding that while nude dancing is entitled to a degree of protection under the Supreme Court's First Amendment jurisprudence, "we are unaware of any constitutional right to drink while watching nude dancing"); *Dept. of Alcoholic Beverage Control*, 121 Cal. Rptr. 2d at 895 (noting that "[t]he State . . . has not prohibited dancers from performing with the utmost level of erotic expression. They are simply forbidden to do so in establishments which serve alcohol, and the Constitution is thereby not offended"). What the First Amendment does require is that establishments like Ben's Bar be given "a 'reasonable opportunity' to disseminate the speech at issue." *North Ave. Novelties, Inc. v. City of Chicago*, 88 F.3d 441, 445 (7th Cir. 1996). A "reasonable opportunity," however, does not include a concern for economic considerations. *Renton*, 475 U.S. at 54.[32]

---

[32] In an affidavit filed with the district court, Barry Breault, part-owner of Ben's Bar, stated that:

> The bulk of Ben's Bar's revenues are derived from beverage sales and associated food sales. Revenues from adult entertainment . . . account for only about one-third of Ben's
> (continued...)

Second, Section 5(b)'s alcohol prohibition, like the one in *LaRue*, is limited to adult entertainment establishments, and does not apply to:

> [T]heaters, performing arts centers, civic centers, and dinner theaters where live dance, ballet, music, and dramatic performances of serious artistic merit are offered on a regular basis; and in which the predominant business or attraction is not the offering of entertainment which is intended for the sexual interests or titillation of customers; and where the establishment is not distinguished by an emphasis on or the advertising or promotion of nude or semi-nude performances.[33]

Ordinance A-472(6). *Compare Giovani*, 303 F.3d at 515 (noting that lack of evidentiary support for adult entertainment liquor regulations "might not pose a problem if the challenged restrictions applied only to bars and clubs that present nude or topless dancing").

Finally, we note that Section 5(b)'s liquor prohibition is no greater than is essential to further the Village's substantial interest in combating the secondary effects resulting from the combination of nude and semi-nude dancing

---

[32] (...continued)

> revenues. *Ben's Bar cannot operate at a profit without the revenue from the sale of alcoholic beverages, and the business such sales bring in.*

(Emphasis added.)

[33] This section of the Ordinance also emphasizes that "[w]hile expressive live nudity may occur within these establishments [those noted in section (6)], this ordinance seeks only to minimize and prevent the secondary effects of Sexually Oriented Businesses on the community. Negative secondary effects have not been associated with these establishments."

and alcohol consumption because, as a practical matter, a complete ban of alcohol on the premises of adult enter- tainment establishments is the *only* way the Village can advance that interest. As the Supreme Court recognized in *LaRue*,

> Nothing in the record before us or in common experi- ence compels the conclusion that either self-discipline on the part of the customer or self-regulation on the part of the bartender could have been relied upon by the Department to secure compliance with . . . [the] regulation[s]. The Department's choice of a prophy- lactic solution instead of one that would have re- quired its own personnel to judge individual instances of inebriation cannot, therefore, be deemed an unrea- sonable one . . . .

409 U.S. at 116. *See also Wise Enterprises, Inc. v. Unified Government of Athens-Clarke County, Georgia*, 217 F.3d 1360, 1364-65 (11th Cir. 2000) (holding that ordinance prohibiting alcohol on the premises of adult entertain- ment establishments satisfied *O'Brien's* requirement that restriction on First Amendment rights be no greater than necessary to the furtherance of the government's interest because "[t]here is no less restrictive alternative"). Indeed, unlike the zoning ordinance at issue in *Alameda Books*, there is no need to speculate as to whether Section 5(b) will achieve its stated purpose. Prohibiting alcohol on the premises of adult entertainment establishments will unques- tionably reduce the enhanced secondary effects resulting from the explosive combination of alcohol consumption and nude or semi-nude dancing.

Given the foregoing, we conclude that Section 5(b) does not violate the First Amendment. The regulation has no impact whatsoever on the tavern's ability to offer nude or semi-nude dancing to its patrons; it seeks to regulate

alcohol and nude or semi-nude dancing without prohibiting either. The citizens of the Village of Somerset may still buy a drink and watch nude or semi-nude dancing. They are not, however, constitutionally entitled to do both at the same time and in the same place. *Gary*, 311 F.3d at 1338 (holding that there is no generalized right to associate with other adults in alcohol-purveying establishments with other adults). The deprivation of alcohol does not prevent the observer from witnessing nude or semi-nude dancing, or the dancer from conveying an erotic message. Perhaps a sober patron will find the performance less tantalizing, and the dancer might therefore feel less appreciated (not necessarily from the reduction in ogling and cat calls, but certainly from any decrease in the amount of tips she might otherwise receive). And we do not doubt Ben's Bar's assertion that its profit margin will suffer if it is unable to serve alcohol to its patrons. But the First Amendment rights of each are not offended when the show goes on without liquor.

## III.

For the reasons expressed in this opinion, Section 5(b)'s prohibition of alcohol on the premises of adult entertainment establishments does not violate the First Amendment. We, therefore, affirm the district court's decision granting the Village's motion for summary judgment.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*