**ERIE BOULEVARD TRIANGLE CORPORATION, d/b/a Another World Books, d/b/a Adult Educational Books; Broadway Schenectady Entertainment, Inc.; Management Consulting Engineering Corp.; and Rocco Palmer, Plaintiffs,**

v.

**CITY OF SCHENECTADY, Defendant.**

No. 00–CV–1716.

United States District Court,
N.D. New York.

March 11, 2003.

City of Schenectady Corporation Counsel (Joseph R. Cardamone, Esq., Of Counsel), Schenectady, NY, for Defendant.

MEMORANDUM–DECISION
and ORDER

HURD, District Judge.

## I. *INTRODUCTION*

Plaintiffs commenced the instant action against the defendant City of Schenectady, New York ("City" or "Schenectady") contending that Schenectady's zoning ordinance regulating adult entertainment businesses violates their constitutional rights. A second cause of action alleges that amendments to the ordinance were not properly enacted. Plaintiffs move for summary judgment pursuant to Fed. R.Civ.P. 56 seeking a declaration that the City's Adult Entertainment Ordinance (hereinafter "Adult Entertainment Ordinance" or "Ordinance") as amended is unconstitutional on its face and as applied to them. Defendants oppose. Oral argument was heard on December 23, 2002 in Albany, New York. Decision was reserved.

## II. *FACTS*

This case was the subject of a prior Memorandum—Decision & Order dated June 29, 2001, *Erie Blvd. Triangle Corp. v. City of Schenectady,* 152 F.Supp.2d 241 (2001), familiarity with which is assumed. The facts pertinent to the instant motion for summary judgment are set forth below.

### A. *The Parties*

Plaintiff Erie Boulevard Triangle, Corp. ("Erie") operates two adult entertainment establishments in Schenectady that offer for sale and rental sexually explicit, non-obscene videos, magazines, and books. (Pls.' Stmnt. of Mat. Facts at ¶ 1.) Plaintiff Management Consulting and Engineering Corp. ("MCEC") owns certain property in

Office of Lee David Greenstein (Lee D. Greenstein, Esq., of Counsel), Albany, NY, for Plaintiffs,

Carter Conboy Case Blackmore Maloney & Laird, P.C. (Michael J. Murphy, Esq., of Counsel), Albany, NY, for Defendant.

Schenectady that it intends to use as an alternative location for an adult bookstore in the event the City's Adult Entertainment Ordinance requires Erie to close its existing stores. (*Id.* at ¶ 2.) Plaintiff Broadway Schenectady Entertainment, Inc. ("Broadway") was formed to operate an adult bookstore on MCEC's property. (*Id.* at ¶ 3.) Plaintiff Rocco Palmer ("Palmer") is a resident of the City and the sole owner of Erie, MCEC, and Broadway. (*Id.* at ¶ 4.) The City is a political subdivision of the State of New York located in Schenectady County, New York. (*Id.* at ¶ 5.)

### B. *Adult Entertainment Ordinance*

In July 1984, the City enacted its adult use zoning regulations. *See* City of Schenectady Code of Ordinance § 264–91. (*Id.* at ¶ 7.) The Adult Entertainment Ordinance confined future adult entertainment business to the City's Light Industrial "G" and Heavy Industrial "H" zoning districts. (*Id.*) Adult entertainment businesses wishing to operate in the City were required to obtain a special permit. (*Id.*) The Ordinance also provided certain "proximity restrictions" within zoning districts G and H. Specifically, adult entertainment businesses could not be located within 500 feet of any other adult use; 500 feet of any building containing one or more dwelling units or rooming units; 1000 feet from the property line of any public or private school, library, park, or playground; or 500 feet from the property line of any church or other house of worship. (*Id.*) Existing adult entertainment establishments were "grandfathered" under the Ordinance. As a result, Erie's two establishments became lawful, non-conforming uses. (*Id.*)

On January 11, 1999, the City adopted City Ordinance 98–25, which amended the Adult Entertainment Ordinance. (*Id.* at ¶ 8; Pl.'s Ex. B.) Ordinance 98–25 altered the way in which the proximity restrictions were calculated; added proximity restrictions with respect to nursery schools, day care centers and primary and secondary schools; eliminated the need for special permits; and terminated the pre-existing, non-conforming uses within one year of January 11, 1999. (*Id.*)

On July 12, 1999, the City adopted Ordinance 99–11 which again amended the Adult Entertainment Ordinance. This amendment provided that adult businesses could not be located within 300 feet of the property line of another adult business. (*Id.* at ¶ 9; Pl.'s Ex. C.) Ordinance 99–11 also terminated pre-existing, non-conforming uses within one year of the Ordinance's enactment. (*Id.*)

On July 25, 1999, the City adopted a new ordinance that expressly repealed the amendments of Ordinance 98–25. (*Id.* at ¶ 10.) On November 13, 2000, the City adopted Ordinance 2000–13, which excluded bicycle and hiking trails from the proximity restrictions. (*Id.* at ¶ 11; Pl.'s Ex. E.) Thus, adult entertainment businesses could be located within 1000 feet of bicycle or hiking trails. (*Id.*) Ordinance 2000–13 was adopted as a direct result of the litigation in *Nikolaidis v. City of Schenectady,* 00–CV–1236. (*Id.* at ¶ 12; Def.'s Ex. A at 85.)

In adopting the amendments to the Adult Entertainment Ordinance, the City relied upon a report prepared by Robert Penna, Ph.D. (the "Penna Report") (*Id.* at ¶ 13.) The Penna Report addressed the adverse secondary effects alleged to be associated with adult entertainment in other municipalities. (*Id.* at ¶ 14.) The report did not specifically study Schenectady. (*Id.*) The City also purports to have relied upon other anecdotal evidence of the secondary effects of sexually oriented businesses. (*See* Brockbank Aff. at ¶¶ 3–7; Oct. 31, 2002 Jurczynski Aff., at ¶¶ 4–8).

This other evidence includes convictions on charges of prostitution of the owner and his wife of a nude dancing facility (the Toy Box) in the City; complaints from police officers regarding sexual activity in and near sexually oriented businesses within the City; citizen complaints of noise, increased crime, declining property values, concern for the welfare of their families, and sexual activity in and near sexually oriented businesses within the City; complaints from business owners; and personal observations of the City's mayor. (*Id.*; May 18, 2001 Jurczynski Aff. at ¶ 5.) The City did not obtain or review any data regarding property values, crime rates, or traffic or noise levels within the vicinity of adult businesses. (Pl.'s Stmnt. of Mat. Facts at ¶ 17.) Further, the City does not have any records of citizen complaints. (*Id.* at ¶ 19.)[1] The only evidence of local secondary effects considered by the City's Planning Commission consisted of the testimony of two residents. (*See* Pl.'s Ex. M, p. 9–10.) One of the residents stated that adult bookstores are an eyesore and threaten the moral character of the City. (*Id.*) The other resident, a representative of the Calvary Baptist Church, testified that adult material is detrimental to the community. (*Id.*)

The amendments to the Adult Entertainment Ordinance were enacted by the City without the substance of the amendments being referred to the City's Planning Commission for review, and without a public hearing or notice to the public of their passage. (Pl.'s Stmnt. of Mat. Facts at ¶ 29.)

## C.   *Enforcement of the Zoning Ordinance Against Erie*

On January 6, 2000, the City provided Erie with notice that it would have to close its adult oriented businesses by July 11, 2000. (*Id.* at ¶ 30.) Erie appealed this determination to the Schenectady Board of Zoning Appeals ("SBZA"). (*Id.* at ¶ 31.) The City opposed the appeal. (*Id.* at ¶ 33.) In June 2000, the SBZA granted Erie an extension to continue operating its adult oriented businesses until June 13, 2001. (*Id.*) On July 7, 2000, the City informed Erie that it was in violation of City Code 128–6 with respect to the use of doors on video booths at the businesses. (*Id.* at ¶ 34.) The City ultimately withdrew its enforcement effort regarding the video booths after receiving a letter from Erie's counsel. (*Id.* at ¶ 36.)

## D.   *Efforts to Obtain an Alternate Location*

In July 2000, plaintiff MCEC purchased certain property within the City purportedly to open an adult entertainment establishment that complied with the Adult Entertainment Ordinance. (*Id.* at ¶ 37.) On August 5, 2000, plaintiff Broadway applied for a building permit to construct a new building to house an adult bookstore. (*Id.* at ¶ 38.) Thereafter, the County of Schenectady commenced eminent domain proceedings to condemn the property purchased by MCEC. (*Id.* at ¶ 39.)

## E.   *Procedural History*

Erie commenced the instant litigation on November 13, 2000, asserting two causes of action. The First Cause of Action contends that the City violated its rights under the United States and New York State Constitutions. The Second Cause of Action contests the procedures employed by the City in adopting Ordinance 2000–13.

---

1.   Albert Jurczynski, Schenectady's mayor, testified at deposition that he received a total of six to eight complaints regarding adult entertainment establishments and had received one complaint since June 29, 2001. (Pl. Stmnt. of Mat. Facts at ¶ 19.)

By Memorandum—Decision & Order dated June 29, 2001, Erie's motion for a preliminary injunction enjoining enforcement of the Adult Entertainment Ordinance was granted. *See Erie Blvd. Triangle Corp.*, 152 F.Supp.2d 241. In that Memorandum—Decision & Order, it was determined that "there is a substantial likelihood that the City will not be able to demonstrate that the eliminating of the grandfathering provision from the Adult Ordinance was designed to further the City's interest in ameliorating the secondary effects of adult businesses within Schenectady." *Id.* at 247–48. By Memorandum—Decision & Order dated July 15, 2002, Erie was granted leave to amend its Complaint to add MCEC and Broadway as plaintiffs. (Dkt. No. 38.) An amended complaint was filed on July 22, 2002. Defendants filed an answer to the amended complaint on September 23, 2002.

### III. *STANDARD OF REVIEW*

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The ultimate inquiry is whether a reasonable jury could find for the nonmoving party based on the evidence presented, the legitimate inferences that could be drawn from that evidence in favor of the nonmoving party, and the applicable burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining a motion for summary judgment, all inferences to be drawn from the facts contained in the exhibits and depositions "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8

L.Ed.2d 176 (1962); *Hawkins v. Steingut*, 829 F.2d 317, 319 (2d Cir.1987). Nevertheless, "the litigant opposing summary judgment 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)).

### IV. *DISCUSSION*

#### A. *Constitutionality of the Adult Entertainment Ordinance*

At issue here is the constitutionality of Schenectady's Adult Entertainment Ordinance. The proper analytical framework is that set forth by a series of Supreme Court decisions including *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) ("*Young*"); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) ("*Renton*"); and *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) ("*Alameda Books*"). Under these cases, the first inquiry is whether the ordinance bans adult uses altogether. *Renton*, 475 U.S. at 46, 106 S.Ct. 925; *see Alameda Books*, 535 U.S. 425, 122 S.Ct. 1728, 1733, 152 L.Ed.2d 670 (2002). If the ordinance does not ban adult uses altogether, but merely imposes zoning restrictions upon them, the ordinance is analyzed as a time, place, and manner regulation. *Alameda Books*, 122 S.Ct. at 1733. Assuming the ordinance to be a time, place, and manner regulation, the second inquiry is whether the ordinance is content neutral. *Id.* If the ordinance is content based, it is "presumptively invalid and subject to strict scrutiny." *Id.* An ordinance that is "aimed not at the content ... but rather at the secondary effects of ... [adult uses] on the

surrounding community, namely at crime rates, property values, and the quality of the city's neighborhood ... [is] ... content neutral." *Id.* at 1734. If the ordinance is content neutral, the third inquiry is whether the "ordinance was designed to serve a substantial government interest and ... reasonable alternative avenues of communication remain[ ] available." *Id.*

### 1. *Ban on Adult Uses*

It is undisputed that Schenectady's Adult Entertainment Ordinance does not ban all adult uses. Rather, it merely seeks to limit the operation of adult entertainment uses to certain zones within the City—"a sort of adult zoning regulation." *Id.* Accordingly, the Adult Entertainment Ordinance must be analyzed as a time, place, and manner regulation. *Alameda Books,* 122 S.Ct. at 1733; *Renton,* 475 U.S. at 46, 106 S.Ct. 925.

### 2. *Content Neutral*

The next inquiry is whether the Adult Entertainment Ordinance is content neutral. *Alameda Books,* 122 S.Ct. at 1733. This entails an examination of whether the ordinance is aimed at the content of the activity at the adult entertainment establishments, or the secondary effects of such establishments on the surrounding community. *Alameda Books,* 122 S.Ct. at 1734; *Renton,* 475 U.S. at 47, 106 S.Ct. 925. "In determining whether a regulation is content-neutral, '[t]he government's purpose [in enacting the regulation] is the controlling consideration.'" *Z.J. Gifts D-2, L.L.C. v. City of Aurora,* 136 F.3d 683, 686 (10th Cir.1998), *cert. denied,* 525 U.S. 868, 119 S.Ct. 162, 142 L.Ed.2d 133 (1998) ("*Aurora*") (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

Although the subject Ordinance is aimed at adult entertainment establishments,

"the inference of impermissible discrimination is not strong. An equally strong inference is that the ordinance is targeted not at the activity, but at its side effects." *Alameda Books,* 122 S.Ct. at 1740 (Kennedy, J., concurring). It is evident from the record that the Adult Entertainment Ordinance was adopted to address the purported secondary effects of adult entertainment establishments upon the surrounding community. "A zoning law need not be blind to the secondary effects of adult speech, so long as the purpose of the law is not to suppress it." *Id.* This conclusion is supported by the preamble to the Adult Entertainment Ordinance, the Penna Report, and the affidavits of the City's major and corporation counsel. (*See* Pl.'s Exs. B, C, J at ¶ 6, M, I; Def.'s Ex. C, D.)

The preamble to the Ordinance states that:

> based upon a comprehensive study of the adverse secondary impacts of adult use establishments as documented by other communities in the country in accordance with the ruling of the U.S. Supreme Court in the matter of the *City of Renton v. Playtime Theaters, Inc.,* ... and commissioned by the Office of the Corporation Counsel, the council of the City of Schenectady finds that:
>
> 1) There are adverse secondary impacts associated with the establishment and operation of adult-oriented businesses within a community;
>
> 2) Among these adverse secondary impacts are a deterioration in the local quality of life, an adverse effect upon local property values, an adverse effect upon local economic viability, an imposition, whether intentional or unintentional, of exposure to adult-oriented expression undesired by neighbors, pedestrians and passersby, an increase in traffic, noise, litter and nuisance, criminal and illicit sexual behavior, a threat to the

health and safety of children and young adults and an undermining of the established sense of community;

3) These adverse secondary impacts of the establishment and operation of adult-oriented businesses are a threat to the general health, safety and economic viability of the community;

4) The unregulated establishment and operation of adult-oriented businesses would lead to the widespread imposition of adverse secondary impacts upon the residents, businesses, economic viability, property values, and quality of life of the City would, therefore, be detrimental to the general health, safety and economic viability of the community....

Whereas, it is the express intent of the City of Schenectady in adopting this chapter to:

a) Ameliorate, mitigate, reduce or prevent the widespread and unregulated imposition of the adverse secondary impacts of adult-oriented businesses upon the residents, businesses, economic viability, property values, quality of life and general health, safety and welfare of the community.

(Pl.'s Ex. B.) *See Renton*, 475 U.S. at 48, 106 S.Ct. 925 (finding an ordinance to be content neutral because "[t]he ordinance by its terms is designed to prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life; not to suppress the expression of unpopular views.") (internal quotation and alterations omitted); *see also Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 723 n. 28 (7th Cir. 2003) (looking to the text of the ordinance, any preamble or express legislative findings associated with it, and studies and information of which legislators were clearly aware to determine the predomi-

nant concerns behind the enactment of an ordinance); *SOB, Inc. v. County of Benton*, 317 F.3d 856, 862 (8th Cir.2003) (looking to the ordinance's stated purposes and legislative findings to determine the intent of ordinance); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 514 (4th Cir.2002) (looking to the ordinance's preamble for language addressing the city's desire to address secondary effects); *Aurora*, 136 F.3d at 686 (relying upon preamble to ordinance in making determination that ordinance was enacted to address secondary effects). This evidences that the purpose of the Adult Entertainment Ordinance was to address the purported secondary effects of adult entertainment establishments.

It also is evident that the City relied upon the Penna Report before adopting the amendments to the Adult Entertainment Ordinance. (*See* Pl.'s Exs. B, C, D, I, J at ¶¶ 6–7.) The Penna Report states, among other things, that:

it is highly probable that the City of Schenectady does and will continue to experience adverse secondary impacts associated with adult entertainment establishments and businesses. We believe that the City therefore can, based upon the experiences of a broad spectrum of counties, towns, and cities across the country, attempt to ameliorate these impacts though the utilization of its ... zoning powers.

(*Id.*) This also evidences that the intent of the Adult Entertainment Ordinance was to address the secondary effects of adult entertainment establishes, and not to limit speech.

■ Finally, the affidavits of Schenectady Mayor Jurczynski and Schenectady Corporation Counsel Michael Brockbank further support the conclusion that the intent of the Adult Entertainment Ordinance was to reduce the secondary effects

of adult entertainment establishments. (*See* Def.'s Ex. C, D.) Plaintiffs offer no evidence from which it can be conclusively determined on a motion for summary judgment that the Ordinance was aimed at specific content rather than the secondary effects of adult entertainment establishments. Accordingly, the Adult Entertainment Ordinance will be evaluated under the intermediate scrutiny standard.

### 3. *Narrowly Tailored to Serve a Substantial Government Interest*

Under the intermediate scrutiny standard, the question is "whether the municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance." *Alameda Books*, 122 S.Ct. at 1737 (plurality opinion). "In conducting this inquiry, [courts] are required . . . to answer two questions: (1) 'what proposition does a city need to advance in order to sustain a secondary-effects ordinance?'; and (2) 'how much evidence is required to support the proposition.' " *Ben's Bar*, 316 F.3d at 721 (quoting *Alameda Books*, 122 S.Ct. at 1741 (Kennedy, J. concurring) [2]); *see also Alameda Books*, 122 S.Ct. at 1736 (plurality opinion) ("The municipality's evidence must fairly support the municipality's rationale for its ordinance."); *see also, SOB, Inc.*, 317 F.3d at 862 ("[T]he fighting issue . . . is whether the [municipality] had sufficient evidence of adverse secondary effects to justify enacting the Ordinance.").

With respect to the first question, Justice Kennedy points out in his concurring opinion in *Alameda Books* that "the necessary rationale for applying intermediate scrutiny is the promise that zoning ordinances like this one will reduce the secondary effects without substantially reducing speech." *Alameda Books*, 122 S.Ct. at 1742. Thus, the City must set forth its proposition. Once the City has done so, the analysis turns to whether there is sufficient evidence to support the proposition. *Alameda Books*, 122 S.Ct. at 1742.

### a. *The City's Proposition* [3]

The relevant inquiry entails an examination of the City's rationale for its Adult Entertainment Ordinance, and more particularly, the amendments thereto. *Alameda Books*, 122 S.Ct. at 1736 (plurality opinion), 1741 (Kennedy, J., concurring). It appears from the face of the Ordinance that it was enacted to reduce the purported secondary effects of adult entertainment establishments. In the original enactment, the Ordinance stated that "adult bookstores and adult entertainment, because of their very nature, are recognized as having serious objectionable characteristics, *particularly when several of them are concentrated under certain circumstances.*" (Pl.'s Mem. of Law at 17) (emphasis added.) Numerous studies and cases discuss "the geographical correlations between the presence or concentration of adult business establishments and enhanced crime rates." *Alameda Books*, 122 S.Ct. at 1734–35 (plurality opinion) and

**2.** There was no majority opinion in *Alameda Books*. Accordingly, it has been noted that "[b]ecause Justice Kennedy's concurrence is the narrowest opinion joining the judgment of the Court in *Alameda Books*, . . . it is the controlling opinion." *Ben's Bar*, 316 F.3d at 722 and 724 n. 30; *See also, SOB, Inc.*, 317 F.3d at 862 n. 1; *Encore Videos, Inc. v. City of*

*San Antonio*, 310 F.3d 812, 819 (5th Cir. 2002).

**3.** Plaintiffs do not challenge the original Adult Entertainment Ordinance, but, rather, attack the constitutionality of the amendments to that Ordinance. (*See* Pl.'s Mem. of Law at 17.) Thus, the ensuing analysis will focus on the amendments.

at 1747–48 (Souter, J., dissenting); *Young,* 427 U.S. at 71 n. 34, 96 S.Ct. 2440. This rational (prohibiting the concentration of adult entertainment establishments) does not, however, explain the amendments, particularly with respect to the termination of the pre-existing, non-conforming uses. The effect of the amendments on plaintiffs would be to require Erie's adult entertainment establishments to relocate to certain zones; not reduce the concentration of adult entertainment establishments. In fact, Ordinance 99–11 reduced the proximity restrictions, thereby contradicting the idea that the secondary effects associated with adult entertainment establishments are reduced when such establishments are dispersed rather than concentrated.[4]

The preamble to the amendments, however, illustrate other purposes of the Ordinance. These other purposes include reducing the effect of adult entertainment establishments on property values, the health and safety of young adults and children, and on the established sense of community and general quality of life in the City. (*See* Pl.'s Ex. B.)[5] These are all goals that have been approved by the Supreme Court. In *Young* and *Renton,* the Supreme Court stated that "a city's 'interest

in attempting to preserve the quality of urban life is one that must be accorded high respect.' " *Renton,* 475 U.S. at 50, 106 S.Ct. 925 (quoting *Young,* 427 U.S. at 71, 96 S.Ct. 2440); *see also Aurora,* 136 F.3d at 688. Requiring adult entertainment establishments to locate to certain sections, or zones, within the City to protect residential neighborhoods and commercial areas from "urban blight" is a valid rationale. *See Renton,* 475 U.S. at 50, 52, 106 S.Ct. 925; *Young,* 427 U.S. at 71–72, 96 S.Ct. 2440; *Deja Vu–Everett–Federal Way, Inc. v. City of Federal Way,* 46 Fed.Appx. 409, 2002 WL 1929375 (9th Cir.2002) ("*Deja Vu* "); *Z.J. Gifts D–4, L.L.C. v. City of Littleton,* 311 F.3d 1220 (10th Cir.2002); *Aurora,* 136 F.3d 683.

**b.** ***The City's Rationale for the Amendments***

The next question is whether the City's evidence supports its rationale for the amendments. In granting plaintiffs' motion for a preliminary injunction, it was found that

The City has submitted no evidence whatsoever that either the 1999 Amendment or the 2000 Amendment was designed to address the secondary effects of adult businesses within the City which

---

4. The Supreme Court has noted that, once a municipality has identified unwanted secondary facts, they are free to adopt schemes they believe will address those secondary effects. "Cities may regulate adult theaters by dispersing them ... or by effectively concentrating them.... It is not our function to appraise the wisdom of the city's decision to require adult theaters to be separated rather than concentrated in the same areas.... The city must be allowed a reasonable opportunity to experience with solutions to admittedly serious problems." *Renton,* 475 U.S. at 52, 106 S.Ct. 925 (internal citations, alterations and quotations omitted).

5. The City's purported interest in reducing "exposure to adult-oriented expression unde-

sired by neighbors, pedestrians and passers-by" (*see* Pl.'s Exs. B and C), is suspect and arguably an impermissible basis upon which to enact the Ordinance. *See Erznoznik v. City of Jacksonville,* 422 U.S. 205, 208–12, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) ("Appellee's primary argument is that it may protect its citizens against unwilling exposure to materials that may be offensive.... But when the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power.... [T]he limited privacy interests of persons on the public streets cannot justify this censorship of otherwise protected speech on the basis of its content.")

were not adequately addressed by the initial version of the Adult Ordinance, or that plaintiff's businesses are responsible for any adverse secondary effects in their current, grandfathered locations.... [T]he City has wholly failed to provide any rational explanation why the elimination of the grandfathering provision under the original version of the Adult Ordinance was necessary to accomplish this objective....

[I]t is clear that the City cannot show that it had before it, and considered, evidence that adverse secondary effects still exist and that the city had a reasonable basis for believing that the new restrictions it enacted would specifically address these effects. In light of the fact that the City's actual experience under the Adult Ordinance demonstrates an absence of evidence of secondary effects, it simply cannot be said that it was reasonable to conclude that a study of other communities was relevant to the issue of whether the grandfathered adult businesses were creating adverse secondary effects within the City. Accordingly ... there is a substantial likelihood that the City will not be able to demonstrate that the eliminating of the grandfathering provision from the Adult Ordinance was designed to further the City's interest in ameliorating the secondary effects of adult businesses within Schenectady.

*Erie Blvd. Triangle Corp.*, 152 F.Supp.2d at 247–48 (internal quotation and citation omitted).

Since that decision, however, the Supreme Court issued its decision in *Alameda Books*. In *Alameda*, the City of Los Angeles conducted a study in 1977 of the effects of adult entertainment establishments. *Alameda Books*, 122 S.Ct. at 1732. The study "concluded that concentrations of adult businesses are associated with higher rates of prostitution, robbery, assaults, and thefts in surrounding communities." *Id.* at 1732. Based upon the study, in 1978, Los Angeles enacted an ordinance prohibiting "the establishment, substantial enlargement, or transfer of ownership of an adult arcade, bookstore, cabaret, motel, theater, or massage parlor, or a place for sexual encounters within 1,000 feet of another such enterprise or within 500 feet of any religious institution, school, or public park." *Id.* Five years later, the City of Los Angeles amended its adult entertainment ordinance by prohibiting "the establishment or maintenance of more than one adult entertainment business in the same building, structure or portion thereof." *Id.* The amendment provided that the operation of an adult arcade, bookstore, cabaret, motel, theater or massage parlor, or place for sexual encounters "shall constitute a separate adult entertainment business even if operated in conjunction with another adult entertainment business at the same location." *Id.* Before enacting the amendments, Los Angeles did not conduct any new studies concerning the success or failure of the prior law, and did not ascertain whether the plaintiffs' non-conforming businesses were responsible for any alleged adverse secondary effects.

The Ninth Circuit struck down the ordinance finding that Los Angeles "failed to demonstrate ... that the prohibition on multiple-use adult establishments was designed to serve its substantial interest in reducing crime." *Id.* at 1734. "The Court of Appeals found that the 1977 study did not reasonably support the inference that a concentration of adult operations within a single adult establishment produced greater levels of criminal activity because the study focused on the effects that a concentration of establishments—not a concentration of operations within a single establishment—had on crime rates." *Id* at 1734–35.

The Supreme Court reversed the Ninth Circuit and approved of Los Angeles's modification of its existing adult entertainment ordinance by relying upon the same 1977 study the City used in enacting the original ordinance. *Alameda Books,* 122 S.Ct. at 1736–38; *see also Deja Vu—EverettFederal Way, Inc.,* 46 Fed.Appx. 409, 2002 WL 1929375. The Supreme Court believed that "it is rational for the city to infer that reducing the concentration of adult operations in a neighborhood, whether within separate establishments or in one large establishment, will reduce crime rates." *Alameda Books,* 122 S.Ct. at 1735. More important, perhaps, the plurality opinion rejected a requirement that the city demonstrate with empirical data that its ordinance will successfully lower the secondary effects. *Id.* at 1736. "Such a requirement would go too far in undermining our settled position that municipalities must be given a reasonable opportunity to experiment with solutions to address the secondary effects of protected speech." *Id.* (internal quotations and citations omitted); *id.* at 1743 ("[W]e have consistently held that a city must have latitude to experiment ... and that very little evidence is required.") (Kennedy, J., concurring); *see also Renton,* 475 U.S. at 52, 106 S.Ct. 925; *Young,* 427 U.S. at 71, 96 S.Ct. 2440. "A municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously." *Id.* Other cases have reached similar results. For example, in *BZAPS, Inc. v. City of Mankato,* 268 F.3d 603, 607 (8th Cir.2001), the Eighth Circuit stated that "once a city has validly forbidden adult uses within a particular area, it may enforce that ordinance against all adult uses in that area without showing that a particular use will produce secondary effects. *Renton* ... does not require cities to dis-

criminate among adult uses." Similarly, in *Deja Vu,* the Ninth Circuit expressly rejected the arguments that: (1) a municipality's amendments to its adult zoning laws were unconstitutional because the municipality had not shown that the then-existing regulations had proven ineffective at curbing the secondary effects of adult uses; and (2) the municipality should be required to conduct its own study to show why the existing regulations need to be modified. *Deja Vu,* 46 Fed.Appx. at 410–11.

█ Thus, the First Amendment is satisfied "so long as whatever evidence the city relied upon is reasonably believed to be relevant to the problem that the city addresses." *Renton,* 475 U.S. at 51–52, 106 S.Ct. 925. Municipalities are not required to conduct empirical studies of the impact of adult entertainment establishments on their own city, but are "entitled to rely on the experiences of ... other cities." *Id.* at 51, 106 S.Ct. 925; *see also Ben's Bar,* 316 F.3d at 725–26; *Encore Videos,* 310 F.3d at 821; *BZAPS, Inc.,* 268 F.3d at 606 (upholding ordinance where municipality relied upon studies of other cities); *Clark v. City of Lakewood,* 259 F.3d 996, 1015 (9th Cir.2001); *Aurora,* 136 F.3d at 687. Further, in the absence of actual and convincing evidence from plaintiffs to the contrary, municipalities need not demonstrate with empirical evidence that its ordinance will successfully reduce crime. *Alameda,* 122 S.Ct. at 1736.

This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the

municipality meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rational in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Id.* at 1736.

■ Plaintiffs contend that there is no evidence substantiating the City's claim that it adopted the Adult Entertainment Ordinance and the amendments thereto to address the alleged secondary effects of adult entertainment establishments. Plaintiffs argue that no evidence other than the Penna Report was considered by the City in support of the Adult Entertainment Ordinance and its amendments, and that the Penna Report itself is unreliable. Plaintiffs further maintain that the loosening of the proximity restrictions contradicts the City's purported rationale for the Ordinance. The City responds that it enacted the Adult Entertainment Ordinance and its amendments to address the impact that adult entertainment establishments allegedly have on crime, property values, retail businesses, urban blight, quality of life, and the tax base. (Murphy Aff. at ¶ 13.) The City relies upon the Penna Report it commissioned in 1998 that analyzes the secondary effects of adult entertainment establishments in other cities, the Supreme Court's decision in *Renton*, complaints from City residents and police officers, the testimony of two citizens at a City Council meeting, the observations of its current mayor, and a 1994 report from New York City.

■ When fairly read, the Penna Report may provide a reasonable basis for the City's decision to require all adult entertainment establishments to relocate to certain zones within the City. For example, the Penna Report identifies a nega-

tive impact on the commercial climate of all the cities studies. (Pl.'s Ex. I.) This negative impact includes decreased commercial property values; the reluctance of commercial establishments to remain, or relocate, next to an adult entertainment establishment; high increases in business turn over rates as compared to areas not containing adult entertainment establishments; and the difficulty in attracting customers to non-adult entertainment businesses that are in close proximity to adult establishments. (*Id.*) The Penna Report also identified, among other things, a negative impact on residential property values. (*Id.*) It is reasonable for the City to conclude that the Penna Report supports the notion that restricting adult entertainment establishments to industrial areas will reduce the secondary effect of those establishments in commercial and residential areas. Thus, a fair-minded trier of fact could reasonably conclude that the evidence upon which the City relied fairly supports the rationale for the Ordinance. Although it would be preferable for the City to have studied the actual effects of adult entertainment establishments in Schenectady, the City did not have an opportunity to assess the efficacy of its proposal because the current pre-existing, non-conforming uses have always been in the commercial locations. In other words, the City cannot know whether requiring adult entertainment establishments to relocate to industrial areas will successfully reduce the unwanted secondary effects in commercial and/or nearby residential zones until all adult entertainment establishments (including those that are now there) are removed from those zones. In any event, the City is not obligated to undertake any such empirical studies. *Alameda Books*, 122 S.Ct. at 1736.

Plaintiffs also attack the basis for the Penna Report and further claim that the existing adult entertainment establishments that operate in Schenectady have operated without incident. These are disputed issues of fact that preclude summary judgment. Plaintiffs' contention that their businesses have operated for many years without adversely affecting the City or neighborhoods is not based on any empirical or other tangential evidence, but upon the conclusory statement of Erie's treasurer that was qualified as being "upon information and belief." (Montal Aff., ¶ 79.) This is an insufficient basis upon which to award summary judgment in plaintiffs' favor. *See Alameda Books,* 122 S.Ct. at 1736. Plaintiffs do not offer any other evidence that disputes the City's factual findings. Although plaintiffs' expert purports to be undertaking an empirical study of the secondary effects of adult entertainment establishments on the City of Schenectady, no such studies are included in the record. Whether the Penna Report is a reliable source upon which the City could reasonably rely is a factual issue inappro-priate for resolution on summary judgment. The City's evidence, including the Penna Report, the evidence of secondary effects discussed in *Renton* and *Northend Cinema, Inc. v. Seattle,* 90 Wash.2d 709, 585 P.2d 1153 (1978), *cert. denied,* 441 U.S. 946, 99 S.Ct. 2166, 60 L.Ed.2d 1048 (1979),[6] and the 1994 report prepared by the New York City Department of City Planning (*see* Pl.'s Exs. B, C, and M), may be sufficient to support its rationale that relocating adult entertainment businesses out of commercial and/or residential areas will decrease the purported negative secondary effects of those establishments in commercial and residential areas—areas in which the City apparently is primarily concerned with improving.[7] *See Renton,* 475 U.S. at 54, 106 S.Ct. 925 ("Renton has not used the power to zone as a pretext for suppressing expression, but rather has sought to make some areas available for adult theaters and their patrons, while at the same time preserving the quality of life in the community at large by preventing those theaters from locating in other areas. This, after all, is the essence of zon-

---

6. It is evident from the Ordinance that the City took *Renton* into consideration when enacting the amendments. (*See* Pl.'s Exs. B, C.) *Renton* discussed the secondary effects of adult entertainment establishments as found in *Northend Cinema. Renton* held that a city is entitled to rely upon the experiences of other cities and the findings summarized in court cases. *Renton,* 475 U.S. at 50–51, 106 S.Ct. 925. Looking at the evidence in the light most favorable to the non-movant, it is reasonable to infer that the City considered the secondary effects discussed in *Renton,* which includes those discussed in *Northend Cinema.*

7. The City points to additional anecdotal evidence that it allegedly relied upon in drafting the ordinances. Such additional anecdotal evidence includes the following: the Rabbit Lounge, an adult entertainment business, was a known hangout for prostitutes and pimps; the owner of the "Toy Box," another adult business, and his wife were convicted of prostitution-related charges; undocumented complaints from residents and neighboring municipalities concerning adult business in Schenectady; undocumented businesses that have left the City and refused to relocate to the City; the Mayor's personal experience regarding property values in the City; studies performed by Oneida County, New York and the City of Utica, New York; and testimony from residents that "establishments of this nature threaten[ ] the moral character of the City," and "[are] detrimental to the City." (*See* Def.'s Ex. C, D; Pl.'s Exs. J, M.) It is unclear whether this other evidence was actually considered by the City when it enacted the Ordinance and the amendments thereto. Even without this evidence, in the absence of clear and convincing evidence to the contrary, the City's evidence is sufficient to withstand Plaintiffs' motion for summary judgment. *See Alameda Books,* 122 S.Ct. at 1736; *Giovani Carandola,* 303 F.3d at 516.

ing.") (internal quotations and citations omitted); *see also Giovani Carandola*, 303 F.3d at 516 ("[A] governmental entity may rely on the 'evidentiary foundation' set forth in [*Renton* and *Young* ] ... to 'conclude that such nude dancing [i]s likely to produce the same secondary effects in its jurisdiction unless the plaintiff produces clear and convincing evidence to the contrary.'") (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 296–97, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion)).

### 4. *Alternative Avenues of Communication*

The City's Ordinance may be found to be unconstitutional if it does not allow for reasonable alternative avenues of communication. *Renton*, 475 U.S. at 53–54, 106 S.Ct. 925. This is because, "[t]hough the inference may be inexorable that a city could reduce secondary effects by reducing speech, this is not a permissible strategy. The purpose and effect of a zoning ordinance must be to reduce secondary effects and not to reduce speech." *Alameda Books*, 122 S.Ct. at 1739–40 (Kennedy, J., concurring). "Content-neutral zoning ordinances ... are permissible so long as 'reasonable avenues of communication' are left open ... a question that is answered through an analysis of how much land is available in which adult businesses may be located under the zoning system." *Littleton*, 311 F.3d at 1239 (quoting *Renton*, 475 U.S. at 53–54, 106 S.Ct. 925). "In undertaking that analysis, the courts must examine what land is actually available, but also must keep in mind that adult businesses must 'fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees.'" *Id.* (quoting *Renton*, 475 U.S. at 54, 106 S.Ct. 925).

The City, through the affidavit of its zoning officer, states that there are 924 acres and 349 parcels located in the G and H zones in which adult entertainment establishments can locate. (Def.'s Ex. H, ¶ 4.) Of these 924 acres and 349 parcels, 439 acres and 101 parcels would be potential sites where adult entertainment businesses could locate. (*Id.*) Taking into consideration the proximity requirements of the Adult Entertainment Ordinance, the City asserts that there are a total of thirteen potential sites for approximately four existing adult entertainment establishments. (*Id.*, ¶ 6.) The City contends that its data is based upon zoning office files "which identify 101 potential lots within G and H zones, identify readily available public access to such lots, identify the properties as suitable for commercial enterprises and are, or have the potential to be, part of an actual business real estate market." (*Id.* at ¶ 8.)

Plaintiffs agree with the City with respect to three potential sites. (Pl.'s Ex R, ¶ 11.) Plaintiffs contend that the remaining potential sites offered by the City are not fit for general commercial operations. According to plaintiffs, two of the sites consist of a local governmental sewage treatment plant and a newspaper printing plant, and therefore, are unlikely to become available for commercial use. (*Id.* at ¶ 14.) Plaintiffs insist that the remaining sites are industrial sites that either do not have the necessary infrastructure (*i.e.* street lights and sidewalks) necessary to protect the public health, safety, and welfare, or cannot provide sufficient parking to comply with other City zoning requirements.

Much of plaintiffs' "evidence," however, consists of supposition; not actual evidence. For example, plaintiffs' expert states that "it is *likely* to be impossible for any of these industrial uses to provide adequate parking for an adult cabaret, and it *could* be problematic for them to provide

parking for an adult bookstore." (Dkt. No. 50 at 16) (emphasis added.) [8] · These possibilities are an insufficient evidentiary basis upon which to rule out the City's proposed sites and grant summary judgment to plaintiffs. These competing opinions merely highlight the existence of issues of fact that preclude the grant of summary judgment in favor of plaintiffs.

### B. *Enactment of Amendments*

 Plaintiffs also attack the amendments to the Adult Entertainment Ordinance on the ground that they were not enacted in accordance with the proper procedures. A proceeding pursuant to N.Y.C.P.L.R. Art. 78 is available to challenge whether an ordinance was enacted in accordance with the proper procedures. *Save Pine Bush, Inc. v. City of Albany,* 70 N.Y.2d 193, 202, 518 N.Y.S.2d 943, 512 N.E.2d 526 (1987). The statute of limitations for Article 78 proceedings is four months. N.Y.C.P.L.R. § 217; *Save Pine Bush,* 70 N.Y.2d at 203, 518 N.Y.S.2d 943, 512 N.E.2d 526. Plaintiffs failed to timely commence an Article 78 proceeding challenging the procedures used to enact the amendments to the Adult Entertainment Ordinance. The plaintiff's second cause of action must be dismissed.

## V. *CONCLUSION*

The City of Schenectady's Adult Entertainment Ordinance does not ban all adult uses and is content neutral. Questions of fact remain whether the Ordinance is narrowly tailored to serve a substantial government interest. Questions of fact also remain whether. the Ordinance allows for reasonable alternative avenues of communication. Plaintiffs failed to timely challenge the procedures used to enact the amendments to the Ordinance.

Accordingly, it is

ORDERED that

1. Plaintiffs' motion for summary judgment is DENIED; and

2. Plaintiffs' Second Cause of Action is DISMISSED.

IT IS SO ORDERED.

---

**8.** *See also id.* at 18 ("[A]n Adult Use *could* be barred by a lack of adequate parking"), 19 ("The vacant parcel that *appears* to be part of a rail yard ... is a permanent occupancy *not* *likely* to relocate."), 19 ("The scrap yard ... is undoubtedly encumbered by serious hazardous waste contamination.") (emphases added).